AMERICAN FINANCIAL SERVICES ASSOCIATION ET AL., APPELLANTS,
*v.* CITY OF CLEVELAND, APPELLEE.

[Cite as *Am. Financial Servs. Assn. v. Cleveland,*
112 Ohio St.3d 170, 2006-Ohio-6043.]

(Nos. 2005–0160 and 2005–0161—Submitted November
30, 2005—Decided November 20, 2006.)

O'DONNELL, J.

{¶ 1} We are called upon again to consider the Home Rule Amendment to the Ohio Constitution—this time in connection with predatory lending, the subject of legislation enacted by the Ohio General Assembly commonly known as Sub.H.B. No. 386 and of local ordinances in the cities of Dayton and Cleveland.

{¶ 2} This case has been certified to us as a conflict between the Second District Court of Appeals, which determined, in its comprehensive review of the law in this field, that predatory lending was not a proper subject for regulation by local ordinance, and the Eighth District Court of Appeals in the instant case, which held that the Cleveland ordinances regulating lending were within Cleveland's home-rule power.

### Substitute House Bill No. 386

{¶ 3} In February 2002, the Ohio General Assembly enacted Sub.H.B. No. 386, 149 Ohio Laws, Part IV, 6938, including new sections R.C. 1.63 and 1349.25 through 1349.37, which incorporated much of the substance of the federal Home Ownership and Equity Protection Act ("HOEPA") of 1994 into Ohio law, requiring lenders to make certain disclosures to mortgagors on certain loans. That legislation defines covered loans as consumer credit mortgage loans that involve Ohio property and are considered "mortgages" as defined in HOEPA, i.e., those having an interest rate that exceeds by more than ten percentage points the yield on Treasury securities or having points and fees that exceed eight percent of the loan or exceed $400.

{¶ 4} Specifically, R.C. 1349.25(D) defines "covered loan," which is the subject of the predatory-lending regulation, as "a consumer credit mortgage loan transaction that meets both of the following criteria:

{¶ 5} "(1) The loan involves property located within this state.

{¶ 6} "(2) The loan is considered a mortgage under section 152(a) of the 'Home Ownership and Equity Protection Act of 1994,' 108 Stat. 2190, 15 U.S.C.A. 1602(aa), as amended, and the regulations adopted thereunder by the federal reserve board, as amended."

{¶ 7} The federal statute referred to, Section 1602(aa), Title 15, U.S.Code, states:

{¶ 8} "(1) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—

{¶ 9} "(A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

{¶ 10} "(B) the total points and fees payable by the consumer at or before closing will exceed the greater of—

{¶ 11} "(i) 8 percent of the total loan amount; or

{¶ 12} "(ii) $400."

{¶ 13} The Ohio statutes impose numerous limitations on the terms and conditions of covered loans, including the amount of a loan payment that can be collected up front from loan proceeds and a prohibition of balloon payments for loans with terms of fewer than five years. R.C. 1349.27.

{¶ 14} Following enactment of Sub.H.B. No. 386, the city of Cleveland promulgated Cleveland Codified Ordinance 659.02, prohibiting any "predatory loan," defined by 659.01(f) as a loan secured by a first mortgage and having an interest rate between four and a half and eight percentage points above the yield on certain Treasury securities or secured by a junior mortgage and having an interest rate between six and a half and ten percentage points above that Treasury yield and that were made under certain enumerated circumstances, i.e., flipping (refinancing under specified conditions), requiring balloon payments, excessive financing of points and fees, and increasing interest rates upon default.

{¶ 15} As a result of the enactment of the Cleveland ordinances, American Financial Services Association, a national trade association representing various financial institutions, filed a complaint in the Cuyahoga County Common Pleas Court seeking declaratory and injunctive relief, asserting that the city's ordinances conflicted with the state statutes involving predatory lending. The trial court granted summary judgment, invalidated the city's predatory-lending ordi-

nances, and found that the state statutes constituted general laws in conflict with the local ordinances.

{¶ 16} Cleveland appealed that determination to the court of appeals, which reversed the trial court and held that the city's predatory-lending ordinances did not conflict with the state statutes, 159 Ohio App.3d 489, 2004-Ohio-6416, 824 N.E.2d 553, at ¶ 37, that the General Assembly could not extinguish the legislative power of a municipal corporation granted by the Constitution, and that R.C. 1.63 was not a general law. Id. at ¶ 30. After determining that its decision conflicted with a decision of the Second District Court of Appeals in *Dayton v. State*, 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, the Eighth District certified the following two questions for review:

{¶ 17} "I: Whether R.C. 1.63 is a general law for purposes of Ohio's home rule amendment.

{¶ 18} "II: Under a home rule analysis, whether local predatory lending ordinances that impose stricter requirements on lending transactions conflict with the state's predatory lending statutes."

{¶ 19} In the conflict case, *Dayton v. State*, 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, the Second District Court of Appeals reviewed dozens of Ohio Supreme Court home-rule cases and described what it regarded as inconsistent forms of analysis used to decide them. In resolving its case, the Second District followed the conflict analysis outlined in *Fondessy Ents., Inc. v. Oregon* (1986), 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797, instead of a preemption analysis, and pointed out that the Eighth District Court of Appeals had also used the same conflict analysis in an earlier home-rule case, *Fairview Park v. Barefoot Grass Lawn Serv., Inc.* (1996), 115 Ohio App.3d 306, 311–312, 685 N.E.2d 300. *Dayton*, 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, at ¶ 81. The court in *Dayton* determined that the regulation of predatory lending involved the use of police power, that the state had enacted general laws on the same subject, that Dayton's local predatory-lending ordinances conflicted with state legislation by regulating loans that were otherwise lawful in Ohio, and that R.C. 1.63, considered in context as part of a comprehensive statutory enactment, constituted a general law. Id. at ¶ 86, 92, 101, 97, and 110.

{¶ 20} We accepted both certified questions and also granted discretionary review to consider the matter and resolve the conflict between the appellate jurisdictions. 105 Ohio St.3d 1496, 2005-Ohio-1666, 825 N.E.2d 620.

{¶ 21} On appeal to this court, American Financial presents two major contentions: (1) R.C. 1.63, considered in context as part of Sub.H.B. No. 386, constitutes a general law of the state and (2) the Cleveland ordinances conflict with state statutes by prohibiting loans permitted by state law. Cleveland contends that R.C. 1.63 is an invalid limitation on its legislative authority and that the city can

regulate lending because the statute is not a general law. We will address these arguments separately.

## Article XVIII—The Home Rule Amendment

{¶ 22} Section 3, Article XVIII, the Home Rule Amendment to the Ohio Constitution, authorizes municipalities "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 23} The first step in a home-rule analysis is to determine "whether the matter in question involves an exercise of local self-government or an exercise of local police power." *Twinsburg v. State Emp. Relations Bd.* (1988), 39 Ohio St.3d 226, 228, 530 N.E.2d 26, overruled on other grounds, *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 20, 539 N.E.2d 103. If an allegedly conflicting city ordinance relates solely to self-government, the analysis stops, because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction. On the other hand, if, as is more likely, the ordinance pertains to concurrent police power rather than the right to self-government, the ordinance that is in conflict must yield in the face of a general state law.

{¶ 24} In the instant case, American Financial and the city of Cleveland agree that the ordinances are police regulations; therefore, we need not consider whether the ordinances constitute an example of local police power because that issue is not contested. We shall next consider whether the state statutes involved here are general laws and, if so, whether the local ordinances are in conflict with them.

{¶ 25} As a preliminary matter, however, we think it important to address the doctrines of statewide concern and preemption as related to home-rule cases.

## The Statewide–Concern Doctrine and Preemption

{¶ 26} The Home Rule Amendment to the Ohio Constitution authorizes municipalities to exercise "all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Section 3, Article XVIII. As George W. Knight, a Franklin County delegate to the 1912 Constitutional Convention, explained during debate on the home-rule provision, the delegates designed the measure to empower municipalities to establish different forms of local self-government, to implement local ordinances not in conflict with general laws of the state, and to "do those things * * * which are not forbidden by the lawmaking power of the state." 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1433. Significantly, he explained that the drafters of

the amendment intended to "leave the power of the state as broad hereafter with reference to general affairs as it has ever been." Id.

{¶ 27} Thus, the delegates intended the Home Rule Amendment to distinguish between state and municipal lawmaking authority. Although the constitutional provision as adopted gave municipalities the exclusive power to govern themselves, as well as additional power to enact local health and safety measures not in conflict with general laws, *"exclusive state power* was retained in those areas where a municipality would in no way be affected or where state dominance seemed to be required." (Emphasis sic.) Vaubel, Municipal Home Rule in Ohio (1978) 1107–1108. That is, where matters of statewide concern are at issue, the state retains the power—despite the Home Rule Amendment—to address those matters. See *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 129, 44 O.O.2d 121, 239 N.E.2d 75 (explaining that the "power granted under Section 3 of Article XVIII relates to local matters and even in the regulation of such local matters a municipality may not infringe on matters of general and statewide concern"). Similarly, *"exclusive municipal power* was created by the Amendments insofar as local self-government power is exercisable by charter municipalities * * *." (Emphasis sic; footnotes omitted.) Vaubel, Municipal Home Rule in Ohio, at 1108. This dichotomy, however, resulted in a third area of shared power "involving the adoption of police regulations, with points of friction between enactments of the two levels of government subject to resolution by the 'no conflict' test." Id.

{¶ 28} As we have stated, " 'It is a fundamental principle of Ohio law that, pursuant to the "statewide concern" doctrine, a municipality may not, in the regulation of local matters, infringe on matters of general and statewide concern.' " *Reading v. Pub. Util. Comm.,* 109 Ohio St.3d 193, 2006-Ohio-2181, 846 N.E.2d 840, ¶ 33, quoting *State ex rel. Evans v. Moore* (1982), 69 Ohio St.2d 88, 89–90, 23 O.O.3d 145, 431 N.E.2d 311. We have consistently upheld this principle. See *State ex rel. Evans v. Moore,* 69 Ohio St.2d at 90, 23 O.O.3d 145, 431 N.E.2d 311 (prevailing-wage law superseded local wage regulation); *State ex rel. Villari v. Bedford Hts.* (1984), 11 Ohio St.3d 222, 225, 11 OBR 537, 465 N.E.2d 64 (calculation of employee benefits), overruled on other grounds, *State ex rel. Adkins v. Sobb* (1986), 26 Ohio St.3d 46, 48, 26 OBR 39, 496 N.E.2d 994; *State ex rel. Adkins,* 26 Ohio St.3d 46, 26 OBR 39, 496 N.E.2d 994 (vacation-leave credits); *Cleveland Elec. Illum. Co. v. Painesville,* 15 Ohio St.2d at 129, 44 O.O.2d 121, 239 N.E.2d 75 (transmission of electricity through high-voltage lines); *State ex rel. McElroy v. Akron* (1962), 173 Ohio St. 189, 194, 19 O.O.2d 3, 181 N.E.2d 26 (licensing of watercraft).

{¶ 29} We recognize, however, that the application of "statewide concern" as a separate doctrine has caused confusion, *Dayton,* 157 Ohio App.3d 736, 2004-Ohio-

3141, 813 N.E.2d 707, ¶ 32–76, because some courts have considered the doctrine a separate ground upon which the state may regulate. As stated by Vaubel, the term "statewide concern" describes "the extent of state police power which was left unimpaired by the adoption of the Home Rule Amendments as well as * * * those areas of authority which are outside the outer limits of 'local' power, i.e., those matters which are neither 'local self-government' nor 'local police and sanitary regulations.' " Vaubel, Municipal Home Rule in Ohio, at 1108. We agree with the Second District Court of Appeals in its conclusion that the doctrine is relevant only in "deciding, as a preliminary matter, whether a particular issue is 'not a matter of merely local concern, but is of statewide concern, and therefore not included within the power of local self-government.' " *Dayton,* 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, ¶ 76, quoting *Billings v. Cleveland R. Co.* (1915), 92 Ohio St. 478, 485–486, 111 N.E. 155.

{¶ 30} Thus, the statewide-concern doctrine falls within the existing framework of the *Canton* test, and courts should consider the doctrine when deciding whether "the ordinance is an exercise * * * of local self-government," *Canton v. State,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9, or whether "a comprehensive statutory plan is, in certain circumstances, necessary to promote the safety and welfare of all the citizens of this state." *Kettering v. State Emp. Relations Bd.* (1986), 26 Ohio St.3d 50, 55, 26 OBR 42, 496 N.E.2d 983. As we explained more than 50 years ago, the Home Rule Amendment was designed to give the "broadest possible powers of self-government in connection with all matters which are *strictly* local," but the framers of the amendment did not want to "impinge upon matters which are of a state-wide nature or interest." (Emphasis added.) *State ex rel. Hackley v. Edmonds* (1948), 150 Ohio St. 203, 212, 37 O.O. 474, 80 N.E.2d 769.

{¶ 31} Through Sub.H.B. No. 386, the General Assembly has expressed its intent to preempt municipal regulation and occupy the field of regulation of predatory lending as an issue of statewide concern. A statement by the General Assembly of its intent to preempt a field of legislation is a statement of legislative intent and may be considered to determine whether a matter presents an issue of statewide concern, but does not trump the constitutional authority of municipalities to enact legislation pursuant to the Home Rule Amendment, provided that the local legislation is not in conflict with general laws. As discussed in *Fondessy Ents., Inc. v. Oregon,* 23 Ohio St.3d at 216, 23 OBR 372, 492 N.E.2d 797, the constitutional authority of municipalities to enact local police regulations emanates from the Constitution and "cannot be extinguished by a legislative provision." In accordance with the approach followed in *Fondessy,* we reaffirm that the conflict analysis as mandated by the Constitution should be used in resolving home-rule cases.

### General–Law Analysis

{¶ 32} In *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus, we announced a four-part test defining what constitutes a general law for purposes of home-rule analysis: "a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." The statute at issue in Canton prohibited municipalities from restricting the location of manufactured homes but contained an exception permitting property owners to use restrictive covenants in deeds to prohibit placement of manufactured homes on certain properties. We held that the pertinent sections of the state statutes did not meet the test, and we invalidated them and permitted Canton to restrict the location of manufactured homes.

{¶ 33} Sub.H.B. No. 386 in effect incorporated parts of the Home Ownership and Equity Protection Act of 1994, i.e., the federal predatory-lending law, into the Revised Code in Ohio's predatory-lending laws, at R.C. 1349.25 through 1349.37. That legislation defined covered loans, R.C. 1349.25(D), and authorized the state to "*solely* * * * regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, * * * in lieu of all other regulation of such activities by any municipal corporation or other political subdivision," R.C. 1.63(A). (Emphasis added.) Therefore, with respect to the first part of our general-law analysis, Sub.H.B. No. 386 is clearly part of comprehensive statewide legislative regulation that relates to all consumer mortgage lending. The existence of this comprehensive statewide legislation and the language of Sub.H.B. No. 386 at R.C. 1.63 permitting the state to "solely * * * regulate the business of originating, granting, servicing, and collecting loans" indicate that this is an area "where state dominance seem[s] to be required." Vaubel, Municipal Home Rule in Ohio, at 1107–1108.

{¶ 34} The second part of our general-law analysis requires that the statute apply uniformly to all parts of the state. Ohio's predatory-lending law subjects every entity making loans in Ohio to the same obligations. Local ordinances such as the ones enacted by the cities of Dayton and Cleveland prevent uniformity because they subject lenders to different, nonuniform standards depending upon the local municipal regulation. Accordingly, our conclusion is that this legislation clearly meets the second part of the test for general laws.

{¶ 35} The third part of the *Canton* test requires that the statute set forth regulations rather than only restrict the ability of a municipality to enact legislation. Thus, "general laws" include statutes "setting forth police, sanitary

or similar regulations and *not* statutes which purport only to grant or to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations." (Emphasis added.) *W. Jefferson v. Robinson* (1965), 1 Ohio St.2d 113, 30 O.O.2d 474, 205 N.E.2d 382, at paragraph three of the syllabus. As stated above, the parties agree that this case involves the use of police power. Sub.H.B. No. 386, as part of a comprehensive regulatory plan, limits and regulates certain lending practices. As such, it fulfills the requirement of this part of the *Canton* test.

{¶ 36} Finally, in accordance with the fourth part of the test, the statute involved must prescribe a rule of conduct upon citizens generally. In this regard, Sub.H.B. No. 386 establishes rules of conduct for all lenders in Ohio and also provides remedies for all consumers subject to predatory loans if lenders violate the state statute. Accordingly, we conclude that Ohio's predatory-lending statutes are general laws because they are part of a comprehensive and uniform statewide enactment setting forth a police regulation that prescribes a general rule of conduct for lending in Ohio.

### Conflict Analysis

{¶ 37} Having concluded that Ohio's predatory-lending statutes constitute general laws, we next consider whether the Cleveland ordinances are in conflict with those state statutes.

{¶ 38} American Financial argues that the Cleveland ordinances conflict with the Revised Code because they prohibit certain terms in loans with interest rates three and a half percentage points below the state's definition of a covered loan in Ohio and because they impose additional restrictions upon and prohibit loans in some instances that are otherwise permissible pursuant to statute.

{¶ 39} Cleveland, on the other hand, contends that its ordinances do not conflict with the state statutes, because its regulatory scheme is prohibitory, meaning that its ordinances do not authorize loans or lending activities actually prohibited by the state. Cleveland further contends that the lack of regulation by the state on certain topics allows local municipal regulation to be more stringent than the state regulation.

{¶ 40} In *Struthers v. Sokol*, we announced the standard for determining whether municipal regulations conflict with general laws of this state: "In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus.

{¶ 41} An examination of our jurisprudence reveals that we have also applied a conflict-by-implication test, which is consistent with the conflict analysis in *Struthers*. In *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 86, 167 N.E.

158, we stated, "When the law of the state provides that a rate of speed greater than a rate therein specified shall be unlawful, it is equivalent to stating that driving at a less[er] rate of speed shall not be a violation of law; and therefore an ordinance of a municipality which attempts to make unlawful a rate of speed which the state by general law has stamped as lawful would be in conflict therewith." In addition, the court noted, "It is not the province of the court to formulate or declare a policy." Id. at 87, 167 N.E. 158.

{¶ 42} Further, in *Neil House Hotel Co. v. Columbus* (1944), 144 Ohio St. 248, 29 O.O. 403, 58 N.E.2d 665, the city of Columbus enacted an ordinance prohibiting all liquor sales after midnight, despite a state statute prohibiting liquor sales after 2:30 a.m. There, we determined that when a state statute proclaimed that liquor may not be sold after a designated hour, "it is equivalent to saying that sales up to that time are lawful, and an ordinance which attempts to restrict sales beyond an earlier hour is in conflict therewith and must yield." Id. at 253, 29 O.O. 403, 58 N.E.2d 665.

{¶ 43} And more recently, in *Lorain v. Tomasic* (1979), 59 Ohio St.2d 1, 13 O.O.3d 1, 391 N.E.2d 726, we considered whether a municipal ordinance establishing a maximum charity bingo payout per session of $1,500, less than the maximum $3,500 allowed by state statute, was authorized by the Home Rule Amendment. We concluded that a conflict existed and held that the local ordinances destroyed the uniform application of a statewide statutory scheme and prevented charities from conducting lawful operations pursuant to state law.

{¶ 44} In *Sheffield v. Rowland* (1999), 87 Ohio St.3d 9, 11, 716 N.E.2d 1121, we decided a home-rule case involving a state statute that required a license from either a local board of health or the state Environmental Protection Agency for all facilities processing construction and demolition debris. In that case, the village of Sheffield had enacted a local ordinance that prohibited all such debris facilities in the village, despite the fact that the state had authorized them by way of a license to operate. Id. at 11–12, 716 N.E.2d 1121. We concluded that the local ordinance conflicted with the state statute because it prohibited the operation of a state-authorized facility. Id. at 12, 716 N.E.2d 1121.

{¶ 45} And in *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 512–513, 605 N.E.2d 66, we considered a state statute, R.C. 3781.01, that established minimum uniform building requirements, which provided that a municipality could make further and additional regulations not in conflict with the state statute. The city of Middleburg enacted structural and fire-safety construction standards that exceeded the standards adopted by the state. Id. at 511, 605 N.E.2d 66. We held that the local standards conflicted only when they prohibited that which the state allows or required that which the state prohibited; thus, because the state had adopted minimum requirements and invited additional municipal regulation, the state did not occupy the field and thereby preempt

municipal regulation, and we concluded that the stricter ordinance standards did not conflict with the state statute.

{¶ 46} In accordance with our earlier decisions in *Schneiderman, Neil House, Lorain, Sheffield,* and *Middleburg Hts.,* we conclude that any local ordinances that seek to prohibit conduct that the state has authorized are in conflict with the state statutes and are therefore unconstitutional.

{¶ 47} In this case, the Cleveland ordinance purports to regulate loans with interest rates three and a half percentage points below those that the state regulates. Specifically, the city of Cleveland in Section 659.02(a)(1) of Cleveland Codified Ordinances prohibits any "predatory loan," which is defined in Section 659.01(f) as either a first mortgage loan having an interest rate between four and a half and eight percentage points above the yield on Treasury securities or a junior mortgage with an interest rate between six and a half and ten percentage points above the yield on Treasury securities, either of which also includes specified loan terms. In addition to a lower threshold for regulation, the municipal ordinance imposes stricter standards and additional requirements on lenders through mandatory loan counseling for the borrower, Section 659.02(a)(2); requiring a specified loan-disclosure notice three days prior to closing on any home-improvement loan, Section 659.03; and requiring the filing of certification of compliance contemporaneously with the recording of a mortgage, Section 659.04. The ordinance also prohibits any direct payments to home-improvement contractors of the proceeds of any residential loan having an interest rate within the specified ranges, Section 659.02(a)(3), and provides criminal penalties for certain violations of the ordinance, Section 659.99.

{¶ 48} Thus Cleveland has undertaken to regulate the making of a loan authorized by the General Assembly. This is directly contradictory to the syllabus in *Struthers v. Sokol* because these ordinances seek to forbid what the statutes allow. Accordingly, the loan regulations of the ordinances are unconstitutional.

{¶ 49} We therefore answer both certified questions in the affirmative: R.C. 1.63, considered in context as part of Sub.H.B. No. 386, is a general law as it affects the ordinances at issue, and Cleveland Codified Ordinances 659.01(f), 659.02(a)(1), (2), and (3), 659.03(a), 659.04, and 659.99 are in conflict with Sub.H.B. No. 386. For these reasons, the judgment of the Eighth District Court of Appeals is reversed.

*Judgment reversed.*

MOYER, C.J., LUNDBERG STRATTON and LANZINGER, JJ., concur.

O'CONNOR, J., concurs in judgment only.

RESNICK and PFEIFER, JJ., dissent.

O'CONNOR, J., concurring in judgment only.

{¶ 50} I agree with the majority that a court must look at a comprehensive regulatory enactment as a whole when determining whether R.C. 1.63 is a general law. I write separately, however, because I believe that the concept of preemption should play a greater role in the analysis of the ordinances in question.

### Preemption in Ohio

{¶ 51} Despite the fact that law of federal preemption is well settled, this court has never adequately explained how the concept of preemption applies in Ohio. Federal legislative preemption power is derived from the Supremacy Clause of the United States Constitution. *Hillsborough Cty., Florida v. Automated Med. Laboratories, Inc.* (1985), 471 U.S. 707, 712–713, 105 S.Ct. 2371, 85 L.Ed.2d 714. That clause generally invalidates "any Thing in the Constitution or Laws of any State to the Contrary" of federal law, Clause 2, Article VI, United States Constitution, and gives Congress the power to expressly preempt an area of law that was traditionally occupied by state regulation but not solely reserved to the states. *Jones v. Rath Packing Co.* (1977), 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604.

{¶ 52} The Ohio Constitution, on the other hand, grants municipalities the power to "exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Section 3, Article XVIII, Ohio Constitution. Like the United States Constitution, the Ohio Constitution invalidates any ordinances "in conflict with general laws." "In conflict with" and "to the contrary" are synonymous, and accordingly we should interpret Section 3, Article XVIII of the Ohio Constitution similarly to the United States Constitution's Supremacy Clause. In other words, we should interpret the Ohio Constitution to permit the General Assembly to preempt by an explicit statement of preemption certain areas of law not exclusively reserved to the municipalities.

{¶ 53} The General Assembly, of course, should not have unlimited power in preempting any area of law it chooses. Although Section 3, Article XVIII of the Ohio Constitution gave municipalities the exclusive power to govern themselves, as well as some additional power to enact local health and safety measures not in conflict with general laws, "*exclusive state power* was retained in those areas where a municipality would in no way be affected or where state dominance seemed to be required." (Emphasis sic.) Vaubel, Municipal Home Rule in Ohio (1978) 1107–1108. That is, where matters of statewide concern are at issue, the state retains the power—despite the Home Rule Amendment and concurrent local interest—to address and remedy those matters. See *Cleveland Elec. Illum.*

*Co. v. Painesville* (1968), 15 Ohio St.2d 125, 129, 44 O.O.2d 121, 239 N.E.2d 75 (explaining that the "power granted under Section 3 of Article XVIII relates to local matters and even in the regulation of such local matters a municipality may not infringe on matters of general and statewide concern").

{¶ 54} As we have stated, " 'It is a fundamental principle of Ohio law that, pursuant to the "statewide concern" doctrine, a municipality may not, in the regulation of local matters, infringe on matters of general and statewide concern.' " *Reading v. Pub. Util. Comm.*, 109 Ohio St.3d 193, 2006-Ohio-2181, 846 N.E.2d 840, ¶ 33, quoting *State ex rel. Evans v. Moore* (1982), 69 Ohio St.2d 88, 89–90, 23 O.O.3d 145, 431 N.E.2d 311. We have consistently upheld this principle. See *State ex rel. Evans v. Moore* at 90, 23 O.O.3d 145, 431 N.E.2d 311 (prevailing-wage law effective despite ordinance purporting to exempt city from the law); *State ex rel. Adkins v. Sobb* (1986), 26 Ohio St.3d 46, 48, 26 OBR 39, 496 N.E.2d 994 (vacation-leave credits); *Cleveland Elec. Illum. Co. v. Painesville*, 15 Ohio St.2d at 129, 44 O.O.2d 121, 239 N.E.2d 75 (siting of high-voltage lines); *State ex rel. McElroy v. Akron* (1962), 173 Ohio St. 189, 194, 19 O.O.2d 3, 181 N.E.2d 26 (use of the waterways by boaters).

{¶ 55} By allowing the state to preempt areas in accordance with the state-wide-concern doctrine, we would acknowledge a principle that the framers of Ohio's Constitution recognized as well: "a comprehensive statutory plan is, in certain circumstances, necessary to promote the safety and welfare of all the citizens of this state." *Kettering v. State Emp. Relations Bd.* (1986), 26 Ohio St.3d 50, 55, 26 OBR 42, 496 N.E.2d 983. As we explained more than 50 years ago, the Home Rule Amendment was designed to give the "broadest possible powers of self-government in connection with all matters which are strictly local," but the framers of the amendment did not want to "impinge upon matters which are of a state-wide nature or interest." *State ex rel. Hackley v. Edmonds* (1948), 150 Ohio St. 203, 212, 37 O.O. 474, 80 N.E.2d 769.

{¶ 56} This court has previously cited two key factors that signal that an issue is one of statewide concern: (1) A need for uniform regulation exists and (2) any local regulation of the matter would have extraterritorial effects. See *McElroy*, 173 Ohio St. at 194, 19 O.O.2d 3, 181 N.E.2d 26 (an issue of statewide concern is one that "has become of such general interest that it is necessary to make it subject to statewide control so as to require uniform statewide regulation"); *State ex rel. Evans v. Moore*, 69 Ohio St.2d at 90, 23 O.O.3d 145, 431 N.E.2d 311 ("municipal regulations which have significant extraterritorial effects are matters of statewide concern"). Where these factors exist and the General Assembly passes express preemption language accompanying statewide regulation, we should invalidate any local ordinances that infringe upon that express preemption.

**Substitute House Bill No. 386**

{¶ 57} In this case, the Ohio General Assembly enacted legislation known as Sub.H.B. No. 386—codified primarily at R.C. 1.63 and 1349.25 through 1349.37— that incorporated much of the federal Home Ownership and Equity Protection Act of 1994. That federal law was designed to ensure that borrowers understand the risks and penalties associated with certain high-cost mortgages before agreeing to be bound by the terms of those loans. See *McIntosh v. Irwin Union Bank & Trust Co.* (D.Mass.2003), 215 F.R.D. 26, 29.

{¶ 58} The Ohio statutory provisions at issue here likewise require creditors to disclose specified information to borrowers in connection with certain mortgage loan transactions. The loans covered by the Ohio statutes are those that involve property in Ohio and (1) carry an interest rate that exceeds by more than ten percentage points the yield on Treasury securities or (2) require the borrower to pay points and fees at or before closing that exceed the greater of eight percent of the loan or $400. R.C. 1349.25(D) and Section 1602(aa), Title 15, U.S.Code. Persons or entities offering those kinds of loans must provide specific disclosures to borrowers in a conspicuous type size and must include a warning to borrowers that they could lose their homes and any money put into them if they fail to meet their obligations under their loans. R.C. 1349.26(A)(2). Also, any creditor who offers to lend money upon terms regulated by the Ohio statutes must tell the borrower the terms of the transaction, including the interest rate, the monthly payment amount, and the amount of any balloon payment. R.C. 1349.26(B).

{¶ 59} R.C. 1349.27 also prohibits certain lending practices, including certain prepayment penalties (subdivision (A)(1)), negative amortization (subdivision (A)(2)), and the financing of credit life insurance (subdivision (I)). If a covered loan includes any term or practice prohibited by the law, the consumer may rescind the transaction. R.C. 1349.29.

{¶ 60} Creditors who violate the Ohio statutes face felony criminal charges. R.C. 1349.31. In addition, the legislation authorizes the Superintendent of Financial Institutions to pursue civil and administrative remedies against persons who violate the predatory-lending statutes. R.C. 1349.34. The state has also created an office of consumer affairs to educate Ohio residents about borrowing and to receive complaints from consumers. R.C. 1349.37.

{¶ 61} Finally, and most important, Sub.H.B. No. 386 provides that the state is the sole entity authorized to regulate the business of originating, granting, servicing, and collecting loans or other forms of credit in Ohio. R.C. 1.63(A). Any municipal regulations affecting lending practices are expressly preempted by the Ohio statutes. Id.

### Application of Preemption

{¶ 62} The General Assembly clearly enacted express preemption language intended to cover the entire field of loan regulation. The only questions remaining are whether R.C. 1.63 and the accompanying regulatory enactment serve as "general laws" and whether the legislature may preempt this field of law.

{¶ 63} As noted above, I agree with the majority that we must consider R.C. 1.63 in conjunction with the regulatory enactment in determining whether there is a general law at issue, thus requiring application of Section 3, Article XVIII, Ohio Constitution. Considered as a whole, the regulatory scheme does satisfy the definition of "general laws."

{¶ 64} After finding that the regulatory enactment including the preemption provision is general law, we then should turn our attention to whether the express preemption of this field is valid. If the preemptive language is valid, there is no need to proceed to any conflict analysis because *any* municipal ordinance touching upon the preempted area is invalid. If, on the other hand, we find that the General Assembly has attempted to preempt an area where there is no statewide concern, the preemption language is void, and the ordinances may stand.

{¶ 65} Determining whether a matter is of statewide or local concern is not always an easy task, and it is unlikely that any definition of "statewide concern" would resolve all uncertainty when questions about home-rule litigation arise. I believe, however, that the factors of extraterritorial effects and the need for state uniformity should be foremost in that determination. The degree of state legislative activity on the subject, the history of state and local regulation on the subject, the method of enforcement, and the amount of state resources allocated to the subject might also aid a court in deciding whether a statewide concern is at issue. And certainly the General Assembly's own statement that a matter is one of statewide concern—perhaps expressed through a legislative provision preempting all local regulation on the subject—is entitled to some weight because matters of public policy are primarily the province of the legislative branch. Consideration of these various factors leads me to conclude that the General Assembly validly preempted the area of loan regulation.

{¶ 66} First, regulation of mortgage lenders historically occurred at the state—not the municipal—level. See, e.g., R.C. 1322.02 et seq. (state licensing of mortgage brokers), R.C. 1322.031 and 1322.041 (state licensing of loan officers), R.C. 1321.51 et seq. (regulating second mortgage loans), R.C. Chapter 1151 (the Savings and Loan Code), R.C. Chapter 1321 (the Small Loans Act), and R.C. Chapter 1101 through Chapter 1129 (the Banking Code). Although the state's

efforts to control predatory lending practices are new, the state is certainly not a new player in the mortgage lending field.

{¶ 67} State dominance in this area is not only a historical reality but a present-day necessity. As the California Supreme Court notes, "securities based on home loans in this market are sold not only on a statewide, but on a national level." *Am. Financial Servs. Assn. v. Oakland* (2005), 34 Cal.4th 1239, 1256, 23 Cal.Rptr.3d 453, 104 P.3d 813.

{¶ 68} Second, by enacting Sub.H.B. No. 386, the General Assembly expressed its view that predatory lending is an issue of statewide concern that must be addressed in a comprehensive and uniform way. Other states have reached similar conclusions. See, e.g., Ariz.Rev.Stat. 6–631 et seq.; Cal.Fin.Code 4970 et seq.; Conn.Gen.Stat. 36a–746 et seq.; N.C.Gen.Stat. 53–243; 63 Penn.Stat. 456.301 et seq. and 456.501 et seq.; Tex.Fin.Code 343.201 et seq.; and Wash.Rev. Code 31.04.005 et seq.

{¶ 69} The California Supreme Court explained the rationale for comprehensive statewide legislation of predatory lending practices. *Am. Financial Servs. Assn. v. Oakland,* 34 Cal.4th 1239, 23 Cal.Rptr.3d 453, 104 P.3d 813 (holding that a city ordinance regulating predatory loans was preempted by a state law on the subject). Local regulation in the lending field threatened to " 'disrupt secondary market transactions' " and to " 'divide the state's economy into tiny geographic markets,' " according to the California Supreme Court, which added that "the state's interest in uniformity in the area of mortgage lending law demonstrably transcends the concerns of a particular municipality." Id. at 1258, 1259, 23 Cal.Rptr.3d 453, 104 P.3d 813, quoting the brief of American Financial Services Association.

{¶ 70} Likewise, a court in New York has held that a city's effort to regulate predatory lending practices was preempted by the state's comprehensive statewide regulatory scheme for predatory loans. See *Mayor of New York v. New York City Council* (2004), 4 Misc.3d 151, 780 N.Y.S.2d 266. That court held that a local law in the city of New York aimed at regulating predatory loans there "would disrupt the operation of state law" and therefore that the local provision had to give way to the statewide concern addressed by the state statute. Id. at 162, 780 N.Y.S.2d 266.

{¶ 71} I find ample support for the view that loan regulation as formulated in Sub.H.B. No. 386 involves a matter of statewide concern and that the legislature has validly preempted this area. Cleveland's ordinances, therefore, must yield to the legislation that the state has enacted to address this statewide concern.

{¶ 72} Whether it has plotted the right course or not, the General Assembly chose a path that it believes will protect vulnerable consumers from predatory lending practices without unduly hindering their access to the equity in their own

homes. Local ordinances like those in Cleveland pose obstacles to the achievement of the state's lawful objectives, and those ordinances might unintentionally harm the persons that they were designed to protect by restricting the infusion of loan capital into selected local housing markets in the state. Statewide regulation of predatory lending practices provides greater predictability and consistency in the mortgage lending field for consumers and lenders alike in all parts of the state.

{¶ 73} Moreover, by establishing the new Office of Consumer Affairs in the Financial Division of the Ohio Department of Commerce, and by giving state officials the authority to pursue civil and administrative remedies against predatory lenders, Sub.H.B. No. 386 reflects the General Assembly's commitment of fresh state resources to the problems created by predatory lending. That commitment further illustrates that the problem is one that poses statewide concerns and is not simply a local health and safety issue that might be properly addressed on a city-by-city basis.

## Conclusion

{¶ 74} I find, then, that the General Assembly acted on a matter of statewide concern when it enacted regulations aimed at predatory lending practices, and because R.C. 1.63 expressly preempts any local regulations in that area, no further conflict analysis is necessary in this case. As explained above, the Ohio Constitution's home-rule provision protects municipalities' authority to govern themselves, and it provides municipalities some authority to control local health and safety matters when the exercise of that authority does not conflict with general laws. But the home-rule provision does not empower municipalities to exercise any authority over matters of statewide concern when the state has enacted statewide legislation and has also chosen to preempt the field. In situations such as this involving statewide preemption on an issue of statewide concern, our inquiry is at an end, and we need not examine whether a local ordinance implemented under a municipality's police powers poses a conflict with a general law of the state.

{¶ 75} If there were no explicit statement of preemption, as in R.C. 1.63, I would pursue the inquiry that we applied in Canton v. State, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9 (explaining that a state statute "takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law"). That analysis is unnecessary in this case, however, because the issue addressed by Sub.H.B. No. 386 is one of statewide concern, and the preemption provision codified in R.C. 1.63 reflects the General Assembly's conclusion that there is no room for local police-power regulation of predatory lending practices to fill any cracks left unad-

dressed by the state statutes or to promote local interests even in ways that do not conflict with those provisions. Rather than enacting a patchwork of differing regulations at the municipal level, local officials who want to impose tighter—or looser—controls on mortgage brokers and other creditors should present their concerns to the public officials in Columbus who are charged with addressing matters of statewide concern.

{¶ 76} Accordingly, I concur in resolving the certified questions in the affirmative.

---

ALICE ROBIE RESNICK, J., dissenting.

{¶ 77} It has long been established that "[i]n determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus. See, also, *State v. Burnett* (2001), 93 Ohio St.3d 419, 431, 755 N.E.2d 857; *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 512, 605 N.E.2d 66. In other words, "[n]o real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa." *Sokol* at 268, 140 N.E. 519.

{¶ 78} It is also well established that "in order for such a conflict to arise, the state statute must positively permit what the ordinance prohibits, or vice versa, regardless of the extent of state regulation concerning the same object." *Cincinnati v. Hoffman* (1972), 31 Ohio St.2d 163, 169, 60 O.O.2d 117, 285 N.E.2d 714. See, also, *State ex rel. King v. Summit Cty. Council*, 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, at ¶ 39; *Cleveland v. Raffa* (1968), 13 Ohio St.2d 112, 114, 42 O.O.2d 329, 235 N.E.2d 138.

{¶ 79} In applying this test to the present dispute, Justice Pfeifer points out in his dissent that "the state statutes do not explicitly permit lenders to make predatory loans at any lower rate [of interest than is covered under the statutes]. The state has stayed out of the fray in that regard." ¶ 118. This should end the inquiry, as Cleveland's ordinances are not in conflict with the state's legislation. By prohibiting loans with interest rates below the rate of loans that the state has undertaken to regulate, Cleveland has not prohibited any conduct or activity that the state has positively allowed or declared to be a right.

{¶ 80} But along comes the majority with a newly created "conflict-by-implication test." The majority claims that its test "is consistent with the conflict analysis in *Struthers*." ¶ 41. Yet the only time that an implied-conflict test has

been mentioned in any of the court's home-rule cases over the 83 years since *Struthers* was in a dissent by Justice Lloyd Brown in *Cincinnati v. Hoffman,* 31 Ohio St.2d at 180–181, 60 O.O.2d 117, 285 N.E.2d 714. And Justice Brown was decidedly more forthright in suggesting the test than is today's majority, for he at least presented it for what it is—an *alternative* to the *Struthers* test. Id. at 180, 60 O.O.2d 117, 285 N.E.2d 714 (Brown, J., dissenting).

{¶ 81} The majority does not define its new test or provide any boundaries for its application. Based on this test, however, the majority reasons that by prohibiting certain lending practices on certain mortgage loans carrying an interest rate of more than ten percentage points above the yield on Treasury securities, the state has impliedly granted lenders an irrefragable right to engage in those same predatory practices in all counties and cities throughout Ohio, so long as they charge a lower interest rate. Having thus found implicit state authority for freedom from regulation while charging interest up to the threshold rate at which the statutory regulations are triggered, the majority is then able to conclude that the ordinances and statutes are in conflict because the former prohibit certain loans with interest rates three and a half percentage points below the rate at which the state has impliedly authorized them.

{¶ 82} This kind of reasoning has already been rejected by the court. Thus, in *Columbus v. Barr* (1953), 160 Ohio St. 209, 212, 52 O.O. 24, 115 N.E.2d 391, the court held, "Prescribing a specific penalty for the operation of gambling transactions for one's own profit does not by indirection legalize the same transactions if carried on not for profit." Similarly, in *Benjamin v. Columbus* (1957), 167 Ohio St. 103, 4 O.O.2d 113, 146 N.E.2d 854, the court held that an ordinance prohibiting the possession or control of pinball machines regardless of whether they award free plays is not in conflict with a state statute prohibiting the possession or control of gambling devices that by definition include only those pinball machines that award free plays. The court explained:

{¶ 83} "Apparently, to the extent that they fail to prohibit the possession or control of machines such as described in the * * * ordinance, the statutes of Ohio may be said to permit such possession or control. However, there is no statute or constitutional provision which authorizes the possession or control of such machines.

{¶ 84} " * * *

{¶ 85} " 'The ordinance merely goes further than the statute in prescribing a penalty for engaging in gambling transactions not covered by the statute.' " Id. at 118, 4 O.O.2d 113, 146 N.E.2d 854, quoting *Barr,* 160 Ohio St. at 212, 52 O.O. 24, 115 N.E.2d 391.

{¶ 86} What the court recognized in these cases, but the majority neglects or refuses to acknowledge, is that permission to act without consequence under state

law is not equatable to permission to act irrespective of municipal regulation. The former may be implied, but the latter kind of permission, which is the essence of home-rule analysis, requires some positive grant of authority by the General Assembly. Otherwise, any form of conduct that could have been but was not expressly prohibited by a state law on the subject would automatically exceed the reach of municipal authority, and there would be little left for municipal regulation.[1]

{¶ 87} Nevertheless, the majority purports to have extracted its test from five of our previous home-rule decisions. Two of the cited decisions have no value whatsoever in the present discussion. In *Sheffield v. Rowland* (1999), 87 Ohio St.3d 9, 716 N.E.2d 1121, the village of Sheffield prohibited debris facilities that were licensed by the state, and the court simply held that the village could not constitutionally prohibit what the state had licensed. Nothing was implied. And it is rather obvious that the court did not find any implied permission under the state statutes or standards in *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.*, 65 Ohio St.3d 510, 605 N.E.2d 66, since the court did not find any conflict in that case.

{¶ 88} The remaining three cases are the heart and soul of the majority's test. In each of these cases, the court held (or purportedly held) that a conflict existed between a statute that prohibited the performance of an act beyond a stated threshold and an ordinance that prohibited the same act from being performed beyond a lower designated threshold. *Lorain v. Tomasic* (1979), 59 Ohio St.2d 1, 4, 13 O.O.3d 1, 391 N.E.2d 726 (ordinance prohibiting the payment of prize money in excess of $1,200 conflicts with statute forbidding the payment of prize money in excess of $3,500); *Neil House Hotel Co. v. Columbus* (1944), 144 Ohio St. 248, 253, 29 O.O. 403, 58 N.E.2d 665 (ordinance forbidding liquor sales after midnight conflicts with state laws permitting liquor sales after 1:00 a.m. and prohibiting liquor sales after 2:30 a.m.); *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 86, 167 N.E. 158 (ordinance prohibiting driving in excess of 15 miles per hour conflicts with statute prohibiting driving in excess of 25 miles per hour).

---

1. Other courts have likewise rejected an implied-conflict analysis for purposes of Section 3, Article XVIII of the Ohio Constitution. See, e.g., *Columbus v. Spingola* (2001), 144 Ohio App.3d 76, 759 N.E.2d 473 (holding that state statute prohibiting certain forms of ethnic intimidation does not impliedly permit other forms of intimidation); *Harris v. Fitchville Twp. Trustees* (N.D.Ohio 2001), 154 F.Supp.2d 1182, 1187 (finding no conflict between local ordinance that prohibited the establishment or operation of an adult cabaret within 1,000 feet of certain real estate and state statute that prohibited the establishment or operation of an adult cabaret within 500 feet of such real estate); *Mentor Green Mobile Estates v. Mentor* (Aug. 23, 1991), 11th Dist. No. 90–L–15–135, 1991 WL 163450 (holding that city ordinance prohibiting more than eight mobile home units per acre does not conflict with state legislation arguably prohibiting more than 12 mobile home units per acre); *E. Cleveland v. Scales* (1983), 10 Ohio App.3d 25, 27, 10 OBR 32, 460 N.E.2d 1126 (holding that former state statute prohibiting certain persons from possessing firearms did not impliedly give other persons a right to possess firearms as against municipal registration requirements).

{¶ 89} But nothing in these cases suggests or supports the establishment of any sort of general rule with respect to the interpretation of statutes setting forth a prohibitory threshold. Instead, the opinions train on the particular facts of the case and the specific language in the statute. Aside from the stated threshold, the statutes in these cases contained language that either directly permitted the conduct that the ordinance prohibited or specifically established its own limitation as the only limitation controlling such conduct.

{¶ 90} In *Schneiderman*, for example, the court did not rest its decision on the mere fact that former G.C. 12603 established a higher prohibited rate of speed than the ordinance. Although the court did say that the statute's prohibition against driving in excess of a specified rate of speed "is equivalent to stating that driving at a less[er] rate of speed shall not be a violation of law," it immediately went on to explain:

{¶ 91} "If such conflict does not appear from the mere fact that the ordinance has assumed to prohibit a rate of speed less than that prohibited by statute, and therefore permitted thereby, the consideration of section 12608, General Code, in connection with section 12603, General Code will leave no doubt upon that subject.

{¶ 92} " * * * The legislative intent and purpose is clearly manifest in the statute [G.C. 12608] when it declares that 'the provisions of section twelve thousand six hundred and three shall not be diminished, restricted or prohibited by an ordinance, rule or regulation of a municipality or other public authority.' Thus it is clearly and conclusively provided that any rate of speed other than that expressly prohibited must be regarded as permitted. * * * A local regulation certainly is in conflict with a general law covering the same subject if it attempts to prohibit that which the statute has expressly provided shall not be 'diminished, restricted or prohibited.' " Id., 121 Ohio St. at 86–87, 167 N.E. 158.

{¶ 93} The court further explained:

{¶ 94} "Practically the same proposition was presented in [*Ex parte Daniels* (1920), 183 Cal. 636, 192 P. 442] as is before the court in the instant case. * * * The statute under consideration in the *Daniels case* * * * prohibited traveling at an unsafe rate of speed, but in no case in excess of a certain maximum, and then expressly prohibited municipalities from fixing as a maximum a lower rate of speed. The court held that thus was the intention of the Legislature clearly manifested 'to declare that the limitation upon speed fixed in the law shall be the only limitation controlling the conduct of the driver of a motor vehicle upon the streets and highways of the state.' It is stated * * *, in the majority opinion, that 'It seems to have been the legislative purpose, by the declaration that "the limitations as to the rate of speed herein fixed shall be exclusive of all other

limitations," to authorize vehicles to travel at those limits within cities and counties.' " Id. at 88, 167 N.E. 158, quoting *Daniels,* 183 Cal. at 643, 192 P. 442.

{¶ 95} Indeed, the court in *Daniels* specifically stated, "If the legislature had merely fixed the maximum speed limit, it is clear that local legislation fixing a lesser speed limit would not be in conflict therewith, but would be merely an additional regulation." Id. at 645, 192 P. 442.

{¶ 96} The court in *Schneiderman* did not, therefore, finally conclude that G.C. 12603 by itself implied a right to drive at any rate of speed not therein prohibited. Instead, the court ultimately held that "[i]t was the legislative purpose, clearly manifested by the provisions of Sections 12603 and 12608, General Code, to permit vehicles to travel upon the streets and highways of the state at any rate of speed not expressly prohibited by statute." Id. at 90, 167 N.E. 158.

{¶ 97} The majority ignores this lengthy and crucial discussion, choosing instead to rely on a single sentence in *Schneiderman* as support for the creation of its conflict-by-implication test.

{¶ 98} Similarly, in *Neil House Hotel Co.,* the statute did in fact expressly permit what the ordinance prohibited. The regulations promulgated by the Liquor Control Board pursuant to G.C. 6064–3 prohibited certain permit holders from selling liquor between the hours of 2:30 a.m. and 5:30 a.m. The ordinance prohibited the sale of liquor after midnight. However, the enabling measures of the Liquor Control Act did not merely proscribe the sale of intoxicants past the hour of 2:30 a.m., but also expressly permitted their sale after 1:00 a.m. Id. at 252, 29 O.O. 403, 58 N.E.2d 665. Indeed, the court did not hold that the state measures impliedly permitted the sale of liquor up to 2:30 a.m. or that the ordinance conflicted with those measures because it prohibited the sale of liquor before 2:30 a.m. Instead, the court held that the state measures "permit the sale and consumption of beer and intoxicating liquors on the premises of designated permit holders *after the hour of midnight,* and a municipal ordinance *which fixes midnight* as the time when the sale and consumption of such beverages must cease, is in conflict therewith and invalid in that respect." (Emphasis added.) Id. at paragraph three of the syllabus. The passage quoted by the majority is merely an adjunct to this holding.

{¶ 99} Finally, the appellant in *Tomasic* was a bingo operator for a charitable organization that was specifically licensed by the state to conduct bingo operations in accordance with the regulatory provisions of the statute. The statute, which contained both the licensing procedure and the prohibition in question, had been enacted pursuant to a recent constitutional amendment that legalized charity bingo. It was these facts, coupled with the statute's prohibition against the payout of more than $3,500 in prizes during any bingo session, that led the court to conclude that the statute gave a licensed charitable organization the right

to pay out up to a maximum of $3,500. Thus, the court explained that "[a]s part of the regulatory scheme the General Assembly has indicated that once a charitable organization is properly licensed, it has a right, pursuant to R.C. 2915.09(B)(5), to pay out up to, but no more than, $3,500 at any bingo session." 59 Ohio St.2d at 3, 13 O.O.3d 1, 391 N.E.2d 726. Indeed, the court never mentioned *Schneiderman* or *Neil House Hotel* in its opinion.

{¶ 100} The majority's claimed support for its conflict-by-implication test is therefore illusory. In order for a conflict to arise in the present context, the state statute must expressly permit what the ordinance forbids or at least give some positive indication that its particular limitation is exclusive of municipal regulation. General expressions of preemption in statutory schemes are insufficient to establish the exclusivity of any particular limitation on conduct. See *Fondessy Ents., Inc. v. Oregon* (1986), 23 Ohio St.3d 213, 215–217, 23 OBR 372, 492 N.E.2d 797.

{¶ 101} Justice Pfeifer is absolutely right: "Municipalities' constitutionally granted right to self-governance should not be undone by implication." ¶ 118. I respectfully dissent.

PFEIFER, J., concurs in the foregoing opinion.

---

**PFEIFER, J., dissenting.**

{¶ 102} I dissent as to the majority's responses to both certified questions. I would hold that R.C. 1.63 is not a general law and that local predatory-lending ordinances that impose stricter requirements on lending transactions do not conflict with the state's predatory-lending statutes.

I

{¶ 103} May the General Assembly, simply through the statement of its intention to do so, be the sole source of lawmaking on a particular subject? Not if Section 3, Article XVIII of the Ohio Constitution is to have meaning. The General Assembly should indeed hold sway upon matters of statewide concern. Whether something is a matter of statewide concern is the threshold question. I would hold that the regulation of mortgage rates is more appropriately dealt with at the local level.

{¶ 104} Ohio is a diverse state, with a diverse economy and a unique mixture of urban and rural communities. A one-size-fits-all rule regarding mortgage rates is ill-suited to a state with the demographic and economic diversity of Ohio. According to the Plain Dealer, the United States Census Bureau recently named Cleveland as the poorest large city in the United States. Suchetka and Galbin-

cea, "Cleveland, Poorest Big City in the U.S., Census Shows," Plain Dealer (Aug. 30, 2006), http://www.cleveland.com/poverty/plaindealer/index.ssf?/base/news/115692731199050.xmlcoll=2thispage=4. Predatory lenders prey on the poor, and Cleveland is thus especially prone to predatory lending and its inevitable aftermath. Is it appropriate for the General Assembly to restrict the ability of municipalities to respond to the problems attendant to poverty?

{¶ 105} I was not a supporter of the four-part test set forth in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, for determining whether a statute constitutes a general law. Id. at ¶ 42 (Pfeifer, J., dissenting). But the *Canton* test is the law and has been relied upon by the majority in this case. The test states:

{¶ 106} "To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." *Canton v. State*, syllabus.

{¶ 107} I believe that the majority has misapplied the facts of this case to the *Canton* test. We are asked in this case whether R.C. 1.63 is a general law. The majority opinion, however, barely addresses R.C. 1.63 in its opinion. On its face, R.C. 1.63 explicitly contravenes the third requirement of the *Canton* test because it "purport[s] only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations." It states:

{¶ 108} "(A) The state solely shall regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, and this regulation shall be in lieu of all other regulation of such activities by any municipal corporation or other political subdivision.

{¶ 109} "(B) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision to regulate, directly or indirectly, the origination, granting, servicing, or collection of loans or other forms of credit constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and with the uniform operation throughout the state of lending and other credit provisions, and is preempted.

{¶ 110} "(C) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and is pre-empted, if the ordinance, resolution, regulation, or other action does either of the following:

{¶ 111} "(1) Disqualifies a person, or its subsidiaries or affiliates, from doing business with such municipal corporation or other political subdivision based upon the acts or practices of such person, or its subsidiaries or affiliates, as an originator, grantor, servicer, or collector of loans or other forms of credit;

{¶ 112} "(2) Imposes reporting requirements or other obligations upon a person, or its subsidiaries or affiliates, based upon such person's, or its subsidiaries' or affiliates', acts or practices as an originator, grantor, servicer, or collector of loans or other forms of credit."

{¶ 113} R.C. 1.63 does not set forth any regulations; it purports only to prohibit municipalities from asserting their own police powers. The first certified question before us deals only with R.C. 1.63, not the rest of the statutes contained in 2002 Sub.H.B. No. 386. R.C. 1.63 fails the third element of the *Canton* test.

{¶ 114} R.C. 1.63 also fails the fourth element of the *Canton* test, since it does not "prescribe a rule of conduct upon citizens generally." R.C. 1.63 requires nothing of citizens generally. It operates only to proscribe political subdivisions from protecting their own citizens from the rapacious acts of predatory lenders. Certainly, no person reading R.C. 1.63 would think that it applied to him or her.

{¶ 115} Since R.C. 1.63 fails to meet the *Canton* test, I would hold that it is not a general law.

## II

{¶ 116} The second question before us today is "whether predatory lending ordinances that impose stricter requirements on lending transactions conflict with the state's predatory lending statutes." I would hold that they do not. In cases of alleged conflict between state law and municipal ordinances, the most important question is whether the municipality's ordinance lessens or weakens the state statute. Does the ordinance prevent the statute from achieving its objectives? Professor George W. Knight, the same delegate for Franklin County cited in the majority opinion, spoke to that issue at the Constitutional Convention of 1912:

{¶ 117} "It is not intended to invade state authority in the least, but to make clear that the municipality has the right to enact such local police, sanitary and other similar regulations as are not in conflict with general laws. It can not take away, however. For instance, take the quarantine laws. A city can not make them less strict than the state, but it can make them more strict." 2 Ohio Constitutional Convention, Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1439.

{¶ 118} Here, no violence is done to the state statutes by Cleveland's stricter standards. The state standards are not flouted. Cleveland's ordinances do not

create an oasis for predatory lenders where they are free from state law. The Cleveland ordinances meet the test from *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, paragraph two of the syllabus, which asks "whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." The Cleveland ordinances do not allow predatory lending at the rate prohibited by the General Assembly. As for the *Struthers* "vice versa," the state statutes do not explicitly permit lenders to make predatory loans at any lower rate. The state has stayed out of the fray in that regard. As the third paragraph of the syllabus in *Struthers* says, "A police ordinance is not in conflict with a general law upon the same subject merely because certain specific acts are declared unlawful by the ordinance, which acts are not referred to in the general law * * *." Municipalities' constitutionally granted right to self-governance should not be undone by implication.

{¶ 119} A second question that should be asked in home-rule analysis is whether the ordinance affects Ohioans outside the boundaries of the municipality. The Cleveland ordinances do not purport to apply to anyone not doing business within Cleveland. Their real effect on Ohioans outside Cleveland, other than perhaps a few financial institutions, is minimal.

{¶ 120} Federal, state, and municipal legislation together can protect Ohioans from predatory lenders. In *Fondessy Ents., Inc. v. Oregon* (1986), 23 Ohio St.3d 213, 215, 23 OBR 372, 492 N.E.2d 797, in allowing a municipality's more stringent regulations on hazardous-waste disposal, the majority wrote that "it is evident that the combined efforts of every level of government (federal, state and municipal) are essential to control and conquer a potentially deadly threat to the public resulting from the disposal of hazardous waste." A combined effort is called for in this case as well.

{¶ 121} The General Assembly has essentially created a minimum standard with statewide breadth, for application from Ada to Zanesville. There is no reason, however, why municipalities afflicted more greatly by the problem of predatory lending cannot create greater protections for their citizens. Can we possibly believe that those protections would be detrimental to this state?

RESNICK, J., concurs in the foregoing opinion.

———————

Vorys, Sater, Seymour & Pease, L.L.P., John Winship Read, and John J. Kulewicz, for appellant American Financial Services Association.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, and Sharon A. Jennings and Holly J. Hunt, Assistant Attorneys General, for appellant Attorney General of Ohio.

Teresa M. Beasley, Cleveland Director of Law, Thomas J. Kaiser, Chief Trial Counsel, and Joseph G. Hajjar, Assistant Director of Law, for appellee.

Bricker & Eckler, L.L.P., and Luther Liggett Jr., urging reversal for amicus curiae Ohio Mortgage Bankers Association.

The Brunner Firm Co., L.P.A., Rick L. Brunner, Michael S. Kolman, and Rebecca L. Egelhoff, urging reversal for amicus curiae Ohio Association of Mortgage Brokers.

Jeffrey D. Quayle; Thompson Hine, L.L.P., Jeffery E. Smith, John T. Sunderland, and Craig A. Calcaterra, urging reversal for amicus curiae Ohio Bankers League.

Legal Aid Society of Cleveland, Julie K. Robie, Harold L. Williams, and Andrea K. Price, urging affirmance for amicus curiae East Side Organizing Project.

Advocates for Basic Legal Equality and Stanley A. Hirtle, urging affirmance for amicus curiae Edgemont Neighborhood Coalition.

Byron & Byron Co., L.P.A., Barry M. Byron, and Stephen L. Byron; and John E. Gotherman, urging affirmance for amici curiae Ohio Municipal League and International Municipal Lawyers Association.