**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Dayton v. State,* **Slip Opinion No. 2017-Ohio-6909.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-6909

THE CITY OF DAYTON, APPELLANT, *v*. THE STATE OF OHIO, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Dayton v. State,* Slip Opinion No. 2017-Ohio-6909.]**

*Home rule—Ohio Constitution, Article XVIII, Section 3—R.C. 4511.093(B)(1), 4511.0912, and 4511.095—Procedures for the use of traffic cameras— Provisions requiring the presence of a law-enforcement officer at each camera, that a ticket cannot be issued unless a vehicle exceeds the posted limit by a stated amount, and that municipalities must conduct a safety study and wage a public-information campaign are not general laws and are unconstitutional.*

(No. 2015-1549—Submitted January 10, 2017—Decided July 26, 2017.)

APPEAL from the Court of Appeals for Montgomery County,

No. 26643, 2015-Ohio-3160.

_____

**FISCHER, J.**

{¶ 1} In this case, we address whether three statutes regulating local authorities' use of red-light and speed cameras qualify as general laws, such that the statutes do not offend the home-rule powers granted to a municipality in Article XVIII, Section 3 of the Ohio Constitution. We hold that R.C. 4511.093(B)(1), which requires that a law-enforcement officer be present at the location of a traffic camera, infringes on the municipality's legislative authority without serving an overriding state interest and is therefore unconstitutional. We also hold that R.C. 4511.0912, which prohibits the municipality from issuing a fine to a driver who is caught speeding by a traffic camera unless that driver's speed exceeds the posted speed limit by 6 m.p.h. in a school or park zone or 10 m.p.h. in other areas, unconstitutionally limits the municipality's legislative powers without serving an overriding state interest. Finally, we hold that R.C. 4511.095, which directs the municipality to perform a safety study and a public-information campaign prior to using a camera, unconstitutionally limits the municipality's home-rule authority without serving an overriding state interest.

I.      FACTUAL BACKGROUND AND PROCEDURAL POSTURE

{¶ 2} Plaintiff-appellant, the city of Dayton, is an Ohio municipality governed by charter. In 2002, Dayton enacted an ordinance permitting its police department to institute a program using traffic cameras to civilly enforce red-light traffic violations to conserve police resources and to reduce traffic violations and accidents. Prior to installing the traffic cameras, Dayton conducted studies to identify those intersections that had a high number of traffic accidents. Almost immediately after installing the traffic cameras, the number of violation-related accidents decreased. Because of the success Dayton had with the red-light cameras, Dayton enacted an amended ordinance in 2010 to use traffic cameras to reduce speeding violations.

**{¶ 3}** Under Dayton's program, cameras take both video and still pictures of vehicles. A police officer then reviews the camera images to confirm that a traffic violation occurred before issuing the owner of the vehicle a "notice of liability." Dayton Ordinance 70.121(D). In part, a "notice of liability" contains the location, date, and time of the traffic violation, copies of the photographs or video of the vehicle, the vehicle's speed if applicable, and the amount of the civil penalty imposed. The vehicle owner then has 30 days to appeal the notice of liability, and an independent hearing officer reviews the appeal.

**{¶ 4}** After Dayton established its program using red-light and speed cameras, a new state law became effective in March 2015, 2014 Am.Sub.S.B. No. 342 ("S.B. 342"). S.B. 342 adopted and amended several Revised Code provisions regulating local authorities' use of automated traffic-enforcement programs. It authorizes local authorities to use photo-monitoring devices for traffic-law violations, subject to certain conditions and regulations. The new law defines a "local authority" as "a municipal corporation, county, or township." R.C. 4511.092(D). R.C. 4511.094(A)(1) and (2) require a local authority using traffic cameras to post signs at its jurisdictional borders and at each location where a traffic camera is present notifying motorists that cameras are used or are present. R.C. 4511.096 requires a law-enforcement officer to examine camera footage to determine whether a traffic violation occurred; if so, the local authority, or a designee, may send a violation notice to the registered owner of the vehicle within 30 days of the violation. R.C. 4511.097 requires that certain information be included on a violation notice sent to a vehicle owner and limits the amount a local authority can levy as a fine for a violation.

**{¶ 5}** S.B. 342 goes beyond establishing procedures for local authorities choosing to use traffic cameras; it also establishes procedures applicable to citizens and entities receiving traffic-camera violations as well as to insurance companies and camera manufacturers. For example, once the registered owner receives notice

of a traffic-camera violation, R.C. 4511.098 and 4511.099 establish that the owner can pay the civil fine, submit an affidavit stating that the owner had not been driving the vehicle at the time of the infraction, or request an administrative hearing. R.C. 4511.099(G) authorizes an appeal of the administrative decision to either a municipal or county court with jurisdiction over the location where the violation occurred. R.C. 3937.411 prohibits insurance companies from considering violations when issuing policies and establishing rates. And R.C. 4511.0911 requires the manufacturers of the photo-monitoring devices to provide maintenance records to local authorities upon request and to attest to the accuracy of the devices annually.

**{¶ 6}** Only three of these many provisions in S.B. 342 are at issue in this case: (1) R.C. 4511.093(B)(1), the officer-present provision, (2) R.C. 4511.0912, the speeding-leeway provision, and (3) R.C. 4511.095, the study and notice provisions.

**{¶ 7}** R.C. 4511.093(B)(1) requires the presence of a full-time law-enforcement officer at each traffic camera: it states that "[a] local authority shall use a traffic law photo-monitoring device to detect and enforce traffic law violations only if a law enforcement officer is present at the location of the device at all times during the operation of the device." *See also* R.C. 4511.092(C) (defining law-enforcement officer).

**{¶ 8}** R.C. 4511.0912 provides that local authorities shall not issue a ticket for a speeding violation unless "the vehicle involved in the violation is traveling at a speed that exceeds the posted speed limit by not less than" 6 m.p.h. in a school zone or park area or 10 m.p.h. in other locations.

**{¶ 9}** Finally, R.C. 4511.095(A)(1) requires local authorities to "[c]onduct a safety study of intersections or locations under consideration for placement of fixed traffic law photo-monitoring devices." Safety studies "shall include an accounting of incidents that have occurred in the designated area over the previous

three-year period and shall be made available to the public upon request." *Id*. In addition, local authorities must conduct "a public information campaign to inform motor vehicle operators about the use of traffic law photo-monitoring devices at system locations prior to establishing any of those locations." R.C. 4511.095(A)(2). Local authorities must publish a notice in an area newspaper informing the public of the location of the system prior to establishing any of those systems. R.C. 4511.095(A)(3). Local authorities must also abide by a 30-day "public awareness warning period" after installing the traffic camera before levying fines. R.C. 4511.095(A)(4).

{¶ 10} Prior to the effective date of S.B. 342, Dayton filed a verified complaint against defendant-appellee, the state of Ohio, seeking declaratory and injunctive relief and challenging the constitutionality of all of S.B. 342 on home-rule grounds. Dayton and the state filed cross-motions for summary judgment. The trial court denied the state's summary-judgment motion and granted in part Dayton's summary-judgment motion. The trial court held that only R.C. 4511.093(B)(1) and (3), 4511.095, and 4511.0912 are unconstitutional because they violate the third and fourth prongs of the "general law" test set forth in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963. The trial court enjoined enforcement of those three specific provisions but did not hold any of the remaining provisions of S.B. 342 unconstitutional. The state appealed, and the Second District Court of Appeals reversed the trial court's judgment. The Second District determined that S.B. 342 satisfies the third and fourth prongs of the *Canton* test and that Dayton failed to meet its burden to establish the unconstitutionality of any provision of S.B. 342 beyond a reasonable doubt. 2015-Ohio-3160, 36 N.E.3d 235.

{¶ 11} This court accepted Dayton's discretionary appeal addressing whether R.C. 4511.093(B)(1), 4511.095, and 4511.0912 ("the contested provisions") violate the Home Rule Amendment and whether courts are required to

analyze the contested provisions individually to determine their constitutionality under the Home Rule Amendment, as opposed to only analyzing the legislation as a whole.

## II.     ANALYSIS

**{¶ 12}** Dayton argues that the Second District erred in reversing the trial court's summary-judgment ruling, which held that the contested provisions of S.B. 342 violate the Home Rule Amendment of Ohio's Constitution. This court reviews a ruling on summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1966). When considering the constitutionality of a statute, this court "presume[s] the constitutionality of the legislation, and the party challenging the validity of the statute bears the burden of establishing beyond a reasonable doubt that the statute is unconstitutional." *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 18. Plaintiffs have a "heavy burden" when attempting to overcome the presumption of constitutionality. *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 10, 539 N.E.2d 103 (1989).

**{¶ 13}** Article XVIII, Section 3 of the Ohio Constitution, the Home Rule Amendment, provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." The Home Rule Amendment provides independent authority to Ohio's municipalities with regard to local police regulations. *W. Jefferson v. Robinson*, 1 Ohio St.2d 113, 115, 205 N.E.2d 382 (1965). Nevertheless, a municipal ordinance must yield to a state statute if "(1) the ordinance is an exercise of the police power, rather than of local self-government, (2) the statute is a general law, and (3) the ordinance is in conflict with the statute." *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17.

**{¶ 14}** The Dayton ordinances in this case are an exercise of police power. *See Marich v. Bob Bennett Constr. Co.*, 116 Ohio St.3d 553, 2008-Ohio-92, 880

N.E.2d 906, ¶ 14 (determining that "the regulation of traffic is an exercise of police power that relates to public health and safety as well as the general welfare of the public"). Moreover, neither party argues to this court that the Dayton ordinances do not conflict with S.B. 342. Therefore, the sole issue in this case is whether the contested provisions of S.B. 342 qualify as general laws.

{¶ 15} In determining whether a statute constitutes a "general law" for purposes of the Home Rule Amendment, this court has consistently applied the four requirements laid out in *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963. *See, e.g., Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 32; *Mendenhall* at ¶ 20; *State ex rel. Morrison v. Beck Energy Corp.*, 143 Ohio St.3d 271, 2015-Ohio-485, 37 N.E.3d 128, ¶ 19. To qualify as a general law under the *Canton* test, a statute must

> (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally.

*Canton* at syllabus. If a statute meets the *Canton* general-law test, then the statute takes precedence over any conflicting municipal ordinances. However, if the general-law test is not satisfied, then the statute is "an unconstitutional attempt to limit the legislative home-rule powers" of municipalities. *Id.* at ¶ 10. Dayton challenges the contested provisions under the third and fourth prongs of the *Canton* test. Because we determine that the contested provisions are unconstitutional under the third prong of the *Canton* test, our analysis will focus solely on that prong. We

recognize, however, that the contested provisions may also be unconstitutional under the fourth *Canton* prong, as asserted in the concurring opinion.

### A. The Third *Canton* Prong: Limiting Municipal Authority

{¶ 16} The third prong of the *Canton* general-law test requires courts to consider whether the statute sets forth police regulations or whether it merely grants or limits municipalities' legislative power to set forth police regulations. *Id.* at ¶ 33. In undertaking this analysis, " 'a statute which prohibits the exercise by a municipality of its home rule powers without such statute serving an overriding statewide interest would directly contravene the constitutional grant of municipal power.' " *Id.* at ¶ 32, quoting *Clermont Environmental Reclamation Co. v. Wiederhold*, 2 Ohio St.3d 44, 48, 442 N.E.2d 1278 (1982). Dayton argues that the Second District erred in analyzing S.B. 342 as a whole under the third *Canton* prong, instead of analyzing each of the contested provisions individually.

{¶ 17} In *Canton*, the court considered whether R.C. 3781.184, which related to the zoning of property for manufactured homes, violated the Home Rule Amendment. R.C. 3781.184(C) provided that political subdivisions must allow manufactured homes to be placed in areas where single-family residences were permitted. R.C. 3781.184(D) created an exception to division (C) that allowed private property owners to prohibit manufactured homes on their land by way of restrictive covenants in deeds. The court determined that "R.C. 3781.184(C), on its face, appears to serve an overriding state interest in providing more affordable housing options across the state." *Canton* at ¶ 33. It then determined, however, that "the exception contained in R.C. 3781.184(D) defeats this purpose." *Id.* According to the court, R.C. 3781.184(C) would have "very little, if any, impact in areas of development having effective deed restrictions or active homeowner associations. Instead, the statute [would] effectively apply only in older areas of the state, i.e., cities where residential areas no longer have effective deed restrictions or no longer have active homeowner associations." *Id.* at ¶ 30. Because

the statute did not serve an overriding state interest, the *Canton* court determined that R.C. 3781.184(C) "purports only to grant or limit the legislative power of a municipal corporation to set forth police, sanitary, or similar regulations." *Id.* at ¶ 33.

{¶ 18} This court confronted the third prong of the *Canton* test in *Ohioans for Concealed Carry, Inc. v. Clyde*, 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967. In *Ohioans for Concealed Carry*, the court considered whether a municipal ordinance that prohibited licensed gun owners from carrying a concealed gun within a city's parks was constitutional under the Home Rule Amendment. The municipal ordinance conflicted with a state statute that allowed a licensed gun owner to carry a gun anywhere in the state, subject to several exceptions that did not include municipal parks. In analyzing the third prong of the *Canton* general-law test, the court determined that the statute went beyond preventing cities from enacting conflicting legislation because the statute "provide[d] a program to foster proper, legal handgun ownership in this state." *Id.* at ¶ 50. The court determined that "[t]he statute therefore represents both an exercise of the state's police power and an attempt to limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations." *Id.; see also Mendenhall*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, at ¶ 24 (determining that R.C. 4511.21 "has extensive scope and does more than grant or limit state powers").

{¶ 19} This court confronted the third prong of the *Canton* test again in *Cleveland v. State*, 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644. The city of Cleveland sought a declaration that former R.C. 4921.25, 2012 Am.Sub.H.B. No. 487,[1] was unconstitutional under the Home Rule Amendment. Former R.C. 4921.25 vested the Public Utilities Commission of Ohio ("PUCO") with the authority to regulate towing entities as for-hire motor carriers, but the second

---

[1] R.C. 4921.25 was previously numbered R.C. 4921.30. The language at issue was first enacted in R.C. 4921.30, Am.Sub.H.B. No. 87, 150 Ohio Laws, Part I, 59, 157-158.

sentence of the statute provided that "[s]uch an entity is not subject to any ordinance, rule, or resolution of a municipal corporation, county, or township that provides for the licensing, registering, or regulation of entities that tow motor vehicles." Cleveland challenged the second sentence of the statute as unconstitutionally infringing on local authorities' abilities to regulate towing companies. This court determined that the statute, when read as a whole, did not merely limit the legislative power of municipalities to set forth police, sanitary, or similar regulations, *Cleveland* at ¶ 13; nevertheless, the court isolated the second sentence of the statute, analyzed it separately, and determined that it was unconstitutional, *id*. at ¶ 16-17. According to the court, "[u]nlike the first sentence of R.C. 4921.25, which subjects towing entities to PUCO regulation, the second sentence fails to set forth any police, sanitary, or similar regulations." *Id.* at ¶ 16.

{¶ 20} Under this court's precedent, so long as a statute serves an overriding state interest with respect to police, sanitary, or similar regulations, then the third prong of the *Canton* general-law test is satisfied, even if the statute limits the legislative authority of municipalities. However, when a statute expressly grants or limits the legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, without serving an overriding statewide interest, then the statute, or a portion of it, violates the Home Rule Amendment. As demonstrated in *Cleveland*, the analysis under the third *Canton* prong requires consideration of the individual statutory provisions. *See id.* Therefore, we agree with Dayton's contention that under the third *Canton* prong, this court must not merely examine S.B. 342 as a whole but must analyze the contested provisions individually, a task that we now undertake.

    *1. The Officer-Present Provision (R.C. 4511.093(B)(1))*

{¶ 21} Under the officer-present provision, R.C. 4511.093(B)(1), "[a] local authority shall use a traffic law photo-monitoring device to detect and enforce traffic law violations only if a law enforcement officer is present at the location of

the device at all times during the operation of the device." R.C. 4511.093(B)(1) tells municipalities how to use their law-enforcement resources when enforcing their traffic laws, thereby limiting municipalities' legislative power. As to whether R.C. 4511.093(B)(1) serves an overriding statewide interest, the state contends that R.C. 4511.093(B)(1) represents a legislative compromise: it is not an outright ban on traffic cameras, but it establishes cameras as secondary enforcement tools so that the officers do not have to stop every violator.

{¶ 22} However, requiring an officer's presence at a traffic camera directly contradicts the purpose of a traffic camera—to conserve police resources. Moreover, R.C. 4511.093(B)(1) does not require that an officer witness the violation, so the traffic camera is still the primary enforcement tool under the statute; it is not a secondary tool as the state contends. Because the officer-present requirement in R.C. 4511.093(B)(1) infringes on municipalities' home-rule authority without serving an overriding state interest, under *Canton,* it is unconstitutional.

### 2. *The Speeding-Leeway Provision (R.C. 4511.0912)*

{¶ 23} Under R.C. 4511.0912, a local authority is prohibited from relying on a photo-monitoring device to issue a ticket unless a vehicle exceeds the posted speed limit by 6 m.p.h. or more in a school zone or park or recreation area or, in all other areas, the vehicle exceeds the posted speed limit by 10 m.p.h. or more. R.C. 4511.0912 dictates how municipalities must enforce speed limits within their territories, thus limiting their legislative power. With regard to whether R.C. 4511.0912 serves an overriding state interest, the state contends that the speeding-leeway provision accounts for errors in the driver's speedometer or a traffic camera's measuring device, and also creates amnesty for minor speeding infractions. We find the state's arguments unpersuasive. As an initial matter, the state's arguments seemingly contradict its contention that the cameras should be a secondary enforcement tool supplementing police officers. Second, S.B. 342

provides motorists with an opportunity to challenge violations in which they can contest issues such as speedometer and traffic-camera malfunctions. *See* R.C. 4511.098 and 4511.099. Third, the speeding-leeway provision in R.C. 4511.0912 would operate as a de facto increase in speed limits in the limited areas covered by a traffic camera. Because R.C. 4511.0912 prohibits the exercise of home-rule powers without also serving an overriding state interest, under *Canton,* it is unconstitutional.

> 3. *The Study and Notice Provisions (R.C. 4511.095)*

{¶ 24} The last of the contested provisions, R.C. 4511.095, requires local authorities to (1) conduct a safety study prior to placing a photo-monitoring device at a location, (2) conduct a public-information campaign about the use of traffic-monitoring devices, (3) inform the public through a local newspaper prior to installing a photo-monitoring device, and (4) once a device is installed, observe a 30-day warning period before issuing a violation.

{¶ 25} R.C. 4511.095 contains no requirement that the placement of the traffic cameras be instructed by or connected in any way to the results of the traffic study. Thus, the statute does not serve the purpose of directing that the devices be placed in spots where authorities have safety concerns. Nor does the statute restrict the number of cameras in a specified area to serve the purpose of avoiding overconcentration.

{¶ 26} Moreover, the public-information campaign, 30-day warning period, and requirement to publish in a local newspaper are of limited scope and duration. The public traveling through municipalities includes motorists who are not members of the local community targeted by the public-information campaign and local-publication requirement. Thus, the statute's requirements do not serve the purpose of ensuring that the public traveling in the area has notice.

{¶ 27} Because the statute's alleged purpose is not served by the requirements it creates, R.C. 4511.095 does not serve an overriding statewide

interest. As a result, R.C. 4511.095 does not set forth state police, sanitary, or similar regulations but instead merely limits a municipality's legislative power to set forth those regulations. Accordingly, the statute fails the third prong of the *Canton* test and is not a general law.

## B. The Continued Viability of *Canton*

{¶ 28} The dissenting opinion suggests that we should abandon the *Canton* test and analyze home-rule issues by determining first whether the municipal ordinance in question involves a police power and then whether the exercise of the police power conflicts with the state's exercise of that power in the corresponding statute. Although the dissents set forth a different approach to home-rule issues, now is not the time for us to reformulate our home-rule analysis.

{¶ 29} Home-rule disputes require us to reconcile two competing constitutional provisions. First, Article II of the Ohio Constitution vests legislative power in the General Assembly. Second, the Home Rule Amendment, Article XVIII, Section 3 of the Ohio Constitution, grants municipalities the authority to exercise certain powers of local self-government. The *Canton* test is the means by which this court reconciles those two provisions and determines whether a statute is a general law pursuant to Article XVIII, Section 3.

{¶ 30} "It is the policy of courts to stand by precedent and not to disturb a point once settled." *Clark v. Snapper Power Equip., Inc.*, 21 Ohio St.3d 58, 60, 488 N.E.2d 138 (1986). While we have noted that the doctrine of stare decisis is less important in the constitutional context than in cases involving the common law or statutory interpretation, *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 6, 539 N.E.2d 103 (1989), we should be careful to revisit settled precedent only when necessary.

{¶ 31} The viability of the *Canton* test is not at issue in this appeal. Neither Dayton nor the state offers any developed argument that the *Canton* test should be modified or overruled. The parties accept the *Canton* test for good reason: we have

applied the test in numerous cases during the nearly 15 years since the decision in *Canton* was announced, and no justice has questioned the viability of the *Canton* test until now. In fact, four years after the announcement of the test, the only dissenting justice in *Canton* conceded that the test is now the law: "I was not a supporter of the four-part test set forth in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, for determining whether a statute constitutes a general law. *Id*. at ¶ 42 (Pfeifer, J., dissenting). But the *Canton* test is the law and has been relied upon by the majority in this case." *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 105 (Pfeifer, J., dissenting). Furthermore, the citizens of Ohio have not exercised their constitutional right to amend the language of the Home Rule Amendment in light of *Canton* and its progeny. This provides additional support to the conclusion that there is no general belief that the *Canton* test should be altered.

**{¶ 32}** Each home-rule case involves unique facts because no two statutes are exactly alike. When analyzing home-rule issues, we apply the *Canton* test to the statute at issue, which results in a conclusion that is unique to that particular statute. The fact that our conclusions in these fact-intensive cases may vary does not mean that we are being inconsistent or that the *Canton* test is unworkable but rather that varying facts applied to varying statutes compel varying outcomes.

**{¶ 33}** Because neither party has raised a well-developed challenge to the *Canton* test and there is no compelling reason to revisit the test at this time, we continue to apply the *Canton* test when analyzing home-rule issues.

### III.    CONCLUSION

**{¶ 34}** We determine that the officer-present provision in R.C. 4511.093(B)(1) fails the general-law test in *Canton*, and we hold that this statute violates Dayton's home-rule authority as provided by Article XVIII, Section 3 of the Ohio Constitution. Therefore, we sever the officer-present provision in R.C. 4511.093(B)(1) and leave intact R.C. 4511.093(B)(2) and (B)(3). *See* R.C. 1.50;

*Cleveland*, 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644, at ¶ 19, citing *Geiger v. Geiger*, 117 Ohio St. 451, 466, 160 N.E. 28 (1927). Similarly, we hold that the speeding-leeway provision in R.C. 4511.0912 is unconstitutional, and we strike the entire statute. Finally, we hold that, under *Canton*, the study and notice provisions of R.C. 4511.095 do not constitute a general law and are unconstitutional, and we strike the statute. We do not address in this appeal the many remaining provisions of S.B. 342.

**{¶ 35}** Accordingly, under *Canton* and its progeny, we reverse the judgment of the Second District Court of Appeals as to R.C. 4511.093(B)(1), 4511.0912, and 4511.095, and the permanent injunction imposed by the trial court is reinstated with respect to those three provisions.

Judgment reversed.

O'CONNOR, C.J., and BALDWIN, J., concur.

FRENCH, J., concurs, with an opinion joined by KENNEDY, J.

O'NEILL, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion joined by O'NEILL, J.

CRAIG R. BALDWIN, J., of the Fifth District Court of Appeals, sitting for O'DONNELL, J.

_____

**FRENCH, J., concurring.**

**{¶ 36}** I concur in the lead opinion's holding that R.C. 4511.093(B)(1), 4511.095, and 4511.0912 violate the Home Rule Amendment, Article XVIII, Section 3 of the Ohio Constitution. Although I agree with the lead opinion that the three statutes are not general laws and that they are unconstitutional limits on the home-rule authority of appellant, the city of Dayton, I write separately because my analysis differs from the analysis in the lead opinion.

**{¶ 37}** Dayton challenges three provisions of 2014 Am.Sub.S.B. No. 342 ("S.B. 342"), which "establish[ed] conditions for the use by local authorities of

traffic law photo-monitoring devices to detect certain traffic law violations," on home-rule grounds. Title, S.B. 342. The contested provisions are R.C. 4511.093(B)(1), which requires a law-enforcement officer's presence at the location of a traffic camera while it is in use; R.C. 4511.095, which requires a municipality to perform a safety study and to wage a public-information campaign before using traffic cameras; and R.C. 4511.0912, which prohibits a municipality from issuing a fine for speeding based on a traffic camera unless the driver's speed exceeds the posted speed limit by a certain number of miles per hour.

{¶ 38} Ohio municipalities derive their powers of self-government from Article XVIII, Section 3 of the Ohio Constitution: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." We are concerned here solely with whether the contested provisions of S.B. 342 are general laws. If they qualify as general laws, then they take precedence over any conflicting municipal ordinance, *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9, citing *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted*, 65 Ohio St.3d 242, 244-245, 602 N.E.2d 1147 (1992), including Dayton's traffic-camera ordinance.

{¶ 39} To qualify as a general law,

a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally.

*Id.* at ¶ 21. If a statute does not satisfy the *Canton* test, it is not a general law, and the statute is "an unconstitutional attempt to limit the legislative home-rule powers" of municipalities. *Id.* at ¶ 10.

{¶ 40} Dayton argues that the contested provisions of S.B. 342 fail the third and fourth prongs of the *Canton* test. This court has analyzed the third prong of the *Canton* test by considering whether a statute that limits municipal authority also serves an overriding statewide interest, *Canton* at ¶ 32, citing *Clermont Environmental Reclamation Co. v. Wiederhold*, 2 Ohio St.3d 44, 48, 442 N.E.2d 1278 (1982), and the lead opinion focuses exclusively on the third prong in this case. The dissent expresses concern that that analysis steers courts perilously close to legislative policy decisions, which are beyond the judiciary's purview. In my view, however, we can avoid considering whether the contested provisions of S.B. 342 serve an overriding state interest because those provisions do not prescribe a rule of conduct on citizens generally, as the fourth prong of the *Canton* test requires.

{¶ 41} Under the fourth prong of the *Canton* test, a statute must "prescribe a rule of conduct upon citizens generally" to qualify as a general law. *Id.* at ¶ 21. The statute at issue in *Canton*—forbidding political subdivisions from prohibiting or restricting the location of permanently sited manufactured homes in any zone or district in which a single-family home was permitted—did not satisfy that requirement because it "applie[d] to municipal legislative bodies, not to citizens generally." *Id.* at ¶ 2, 36. In contrast, a statute that established speed limits and stated, " 'No person shall operate a motor vehicle * * * at a speed greater or less than is reasonable or proper,' " prescribed a rule of conduct upon citizens and satisfied the fourth prong of the *Canton* test. *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 25, quoting R.C. 4511.21.

{¶ 42} In *Linndale v. State*, 85 Ohio St.3d 52, 706 N.E.2d 1227 (1999), this court considered a home-rule challenge to former R.C. 4549.17, which prohibited local law-enforcement officers from issuing speeding and excess-weight citations

on interstate freeways when (1) less than 880 yards of the freeway were within the locality's jurisdiction, (2) local officers had to travel outside their jurisdiction to enter onto the freeway, and (3) local officers entered the freeway with the primary purpose of issuing the citations. *Linndale* predates *Canton*, but the court nevertheless addressed factors that it would later incorporate into the *Canton* general-law test. *Linndale* at 55. The court held that R.C. 4549.17 was not a general law but was simply a limit on the legislative powers of municipalities to adopt and enforce police regulations. *Id.* As relevant here, the court stated that the statute did "not prescribe a rule of conduct upon citizens generally." *Id.*

{¶ 43} We reached a similar conclusion in *Youngstown v. Evans*, 121 Ohio St. 342, 168 N.E. 844 (1929). The statute at issue there limited municipalities' authority to set punishments for misdemeanor violations of a municipal ordinance. This court stated that the statute was "not a general law in the sense of prescribing a rule of conduct upon citizens generally. It is a limitation upon law making by municipal legislative bodies." *Id.* at 345.

{¶ 44} Unlike the speed-limit statute in *Mendenhall*, the contested provisions here do not dictate a rule of conduct applicable to citizens of the state. Indeed, nothing in S.B. 342 directs citizens' conduct with respect to the operation of a motor vehicle. Driving in excess of the speed limit and running a red light are violations of the law, whether or not a traffic camera exists to record the violation and whether or not a law-enforcement officer has authority to issue a citation. The contested provisions are phrased in terms of what a local authority shall or shall not do. They apply not to citizens but to municipalities. Like the statute in *Linndale*, the contested provisions of S.B. 342 merely limit municipal authority to enforce other substantive laws.

{¶ 45} Viewing the contested provisions in relation to the rest of S.B. 342 does not lead to a different conclusion. As stated in its title, the purpose of S.B. 342 is "to establish conditions for the use by local authorities of traffic law photo-

monitoring devices," and the bulk of the act does exactly that, by establishing limitations on municipalities' exercise of their police authority to enforce traffic laws. The fact that the act establishes steps a driver could take to contest an alleged violation, prohibits insurers from considering violations that result from traffic cameras, and requires traffic-camera manufacturers to provide a certificate of proper operation for their products does not demonstrate that the contested provisions, or the act in general, prescribes a rule of conduct upon citizens generally. Nor does the fact that other provisions in R.C. Chapter 4511, unrelated to traffic cameras and not part of S.B. 342, describe substantive traffic offenses satisfy the fourth prong of the *Canton* test. *See Linndale*, 85 Ohio St.3d 52, 706 N.E.2d 1227 (not considering other provisions of R.C. Chapter 4549, which established substantive offenses, when concluding that R.C. 4549.17 did not prescribe a rule of conduct upon citizens generally).

{¶ 46} For these reasons, I conclude that the contested provisions of S.B. 342 do not satisfy the fourth prong of the *Canton* test, are not general laws, and are therefore an unconstitutional restriction on Dayton's home-rule authority. Accordingly, I concur in the lead opinion's holding that R.C. 4511.093(B)(1), 4511.095, and 4511.0912 are unconstitutional, albeit on different grounds.

KENNEDY, J., concurs in the foregoing opinion.

———————————

**O'NEILL, J., dissenting.**

{¶ 47} I join Justice DeWine's well-reasoned dissenting opinion. I write separately to add some clarifying thoughts on interpreting the Home Rule Amendment, Article XVIII, Section 3, Ohio Constitution. I reiterate Justice DeWine's view that the test created in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, has become unworkable and that home-rule cases should be resolved by applying the text of the Constitution. This is particularly true in the context of municipal laws that conflict with state laws regulating police

power. The text of the amendment provides, "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Article XVIII, Section 3, Ohio Constitution. Thus the text of the Home Rule Amendment clearly states that if a municipal law that exercises police power is in conflict with a general law exercising police power, the municipal law must yield. In this case, the state and the city both seek to exercise police power. The state statutes apply throughout the state; they are general laws exercising police power. There is no ambiguity in the state statutes, and there is no need to conjure an overriding state interest. When the text is clear, as it is here, it should be applied by this court. *Sears v. Weimer*, 143 Ohio St. 312, 55 N.E.2d 413 (1944), paragraph five of the syllabus.

{¶ 48} A uniform system of traffic laws promotes public safety, certainty, and public confidence. R.C. 4511.06 requires the uniform application of traffic laws and prohibits local authorities from enacting or enforcing any rule in conflict with the state's uniform traffic laws. As Justice DeWine ably points out, "[l]ocal authorities are bound by the state's manual for a uniform system of traffic-control devices and may use only those devices that conform with state standards. *Winwood v. Dayton*, 37 Ohio St.3d 282, 284, 525 N.E.2d 808 (1988); *Bibler v. Stevenson*, ___ Ohio St.3d ___, 2016-Ohio-8449, ___ N.E.3d ____, ¶ 14; R.C. 4511.11(A), (D) through (F)." Dissenting opinion of DeWine, J., at ¶ 71. For example, even if a city or village believes its stop signs should be blue, stop signs are red because the state requires them to be red. This uniformity is a matter of public safety and public confidence. Our state Constitution and statutes and this court's caselaw specify that home-rule regulations must yield to state law under these circumstances.

{¶ 49} Here, metaphorically speaking, the city of Dayton seems to prefer blue stop signs, and it suggests that forcing a city to have red stop signs violates the Ohio Constitution. Surprisingly, the majority opinion agrees. I do not.

{¶ 50} Regulating the use of traffic cameras throughout the state is the same as regulating traffic signage and speed limits. I join Justice DeWine's view that the majority opinion in this case usurps the role of the General Assembly as the body that makes policy for the state. The General Assembly has said that stop signs are red and traffic cameras need a police officer to watch them doing their work. I do not agree with what the General Assembly has said here, but the Ohio Constitution requires me to agree with the legislature's right to say this, absurd though it may be.

{¶ 51} I dissent.

_____

**DEWINE, J., dissenting.**

{¶ 52} Today's decision has the unfortunate impact of further muddling a body of law that is already hopelessly confused. A fractured majority of this court decides that three statutory provisions relating to traffic cameras violate the Home Rule Amendment, Article XVIII, Section 3 of the Ohio Constitution. The three justices who join the lead opinion find the provisions unconstitutional because they don't believe the provisions are in the overriding interest of the state. Two other justices say the provisions are lacking because they do not set forth a rule of conduct for citizens generally. But as in many cases in this area, the result today seems to have everything to do with the policy preferences of the majority and nothing to do with the language of the Home Rule Amendment.

{¶ 53} The Home Rule Amendment reads simply: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Nothing in the amendment makes the

constitutionality of a legislative enactment turn upon this court's best guess about what is in the state's interest. Nor does the amendment ask whether a legislative enactment prescribes a rule of conduct for citizens generally. The questions we have to answer are dictated by the language of the amendment: Is the statute a general law? Is the municipal regulation an exercise of police powers? And is there a conflict? Because I determine that all three of the challenged provisions are general laws, and because there is no dispute that the ordinances enacted by appellant, the city of Dayton, are an exercise of police power that conflicts with these general laws, I would uphold the statutes. Accordingly, I dissent from the judgment of the court.

{¶ 54} The majority reaches its result not through application of the language of the Home Rule Amendment but by relying upon the judicially created *Canton* test. *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963. As demonstrated by a decade and a half of inconsistent case law—now including the lead opinion and separate concurrence in this case—the *Canton* test has proved unworkable. It is time we abandon the test and return to the language of the Home Rule Amendment.

## I. Our Home Rule Jurisprudence

{¶ 55} Few areas of our law have proved as troublesome as the application of the Home Rule Amendment. Since the adoption of the amendment in 1912, we have considered no fewer than 100 cases in which we have endeavored to decide whether an enactment by the General Assembly overrides a municipal law. The sheer volume of these cases is indicative of—and a consequence of—our failure to articulate and apply clear and consistent standards. The result is that neither cities nor the legislature can say with any particular degree of certainty—on any particular day—who can do what.

**{¶ 56}** The most vexing question has been the one at issue here—what constitutes a general law? To answer this question, this court developed the four-part test first set forth in *Canton*:

> To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally.

*Canton* at syllabus.

**{¶ 57}** The *Canton* test was this court's attempt to synthesize nine decades of divergent opinions analyzing the meaning of "general laws." But rather than provide clarity, its application has led to wildly inconsistent results. Thus, this court has held that the legislature may prohibit a city from regulating firearms, *Cleveland v. State,* 128 Ohio St.3d 135, 2010-Ohio-6318, 942 N.E.2d 370, but not from regulating tow trucks, *Cleveland v. State,* 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644. Bans on the municipal regulation of predatory lenders are okay, *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776; bans on the municipal regulation of the location of manufactured homes are not, *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963. And while it has been long understood that the General Assembly may establish statewide speed limits, R.C. 4511.21, and standards for traffic signals in cities, R.C. 4511.11 and 4511.12, we learn today that the General Assembly may not regulate the cameras that cities use to monitor a driver's compliance with speed limits and traffic signals.

**{¶ 58}** Today's lead and concurring opinions only add to the confusion. As I will explain, under our traditional standards, both opinions misapply the *Canton* test in concluding that the three provisions violate the Home Rule Amendment. But in my view, the answer is not to further tinker with the *Canton* test; rather, we should look to the plain and ordinary meaning of "general law" as it was understood at the time of the adoption of the Home Rule Amendment.

## II. The Lead Opinion's Application of the *Canton* Test

**{¶ 59}** A plurality of this court determines that the contested statutes from 2014 Am.Sub.S.B. No. 342 ("S.B. 342")—R.C. 4511.093(B)(1) ("the officer-present provision"), 4511.095 ("the safety-study and publicity provision"), and 4511.0912 ("the speeding-leeway provision")—fail to satisfy the third *Canton* factor. That is, the plurality finds that the statutes, rather than setting forth police regulations, merely limit municipalities' legislative power to set forth police regulations.

**{¶ 60}** The lead opinion reaches this conclusion by determining that none of the statutes serves an overriding state interest. This overriding-state-interest language appears nowhere in the language of the *Canton* test and nowhere in the language of Article XVIII, Section 3 of the Ohio Constitution. Rather, the overriding-state-interest concept was first expressed in *Clermont Environmental Reclamation Co. v. Wiederhold*, 2 Ohio St.3d 44, 442 N.E.2d 1278 (1982), a case involving a statute that prohibited municipalities from placing conditions on the construction and operation of state-permitted hazardous-waste facilities. This court stated that "a statute which prohibits the exercise by a municipality of its home rule powers without such statute serving an overriding statewide interest would directly contravene the constitutional grant of municipal power." *Id.* at 48. But to determine whether a statute infringes on municipalities' home-rule powers, we explained that the statute should not be looked at in isolation. Instead, it must be read together with other statutory sections as part of an entire statutory scheme.

24

Because the statute in question was part of a broader statutory scheme governing the siting and operation of hazardous-waste-disposal facilities, and because that statutory scheme was reasonably calculated to achieve the legislature's goals, we held that it was "a valid general law which supersedes any conflicting municipal ordinance." *Id.* at 49.

**{¶ 61}** *Clermont* thus stands for the proposition that "sections within a chapter will not be considered in isolation when determining whether a general law exists." *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 27. But here the lead opinion does just the opposite—it chooses to look at each individual provision in isolation and then to evaluate as a matter of policy whether it finds the provision to be a good idea or not.

**{¶ 62}** After deciding to evaluate the individual provisions in isolation, the plurality turns to the "overriding state interest" test. Here, it is hard to discern that the plurality is doing anything other than applying its own policy judgments as to the wisdom of the legislation.

**{¶ 63}** For example, in determining that there is no overriding state interest behind the officer-present requirement, it opines that requiring an officer's presence "directly contradicts the purpose of a traffic camera—to conserve police resources." Lead opinion at ¶ 22. To start with, it is difficult to understand why this matters. The analysis should be about the purpose of the legislation, not the purpose of a traffic camera.

**{¶ 64}** Moreover, the "purpose" of a traffic camera is itself a debatable point. As the state explained in its brief, the legislation was a compromise stemming from a longstanding argument between those who believed that some local authorities were using traffic cameras primarily to generate revenue and others who asserted that traffic cameras were employed for valid safety reasons. Compromises are by their nature often imperfect. Here, the legislature presumably sought a way to deal with concerns that traffic cameras were being misused for

revenue purposes while at the same time allowing municipalities some opportunity to use the devices. The lead opinion apparently doesn't share the concern about the misuse of traffic cameras. But that should not make the legislative compromise invalid. Indeed, the question left unanswered by the plurality is why it is better suited than the legislature to determine what is in the overriding interest of the state.

{¶ 65} The lead opinion finds fault with R.C. 4511.095 by concluding that its safety-study and notice requirements do not meet the lead opinion's own standards of usefulness. As for the safety-study provision, which requires "an accounting of incidents that have occurred in the designated area over the previous three-year period," R.C. 4511.095(A)(1), the lead opinion complains that because the statute fails to specifically tie study results to implementation of cameras, it "does not serve the purpose of directing that the devices be placed in spots where authorities have safety concerns" or "restrict the number of cameras in a specified area to serve the purpose of avoiding overconcentration." Lead opinion at ¶ 25. The plurality establishes what it thinks the purpose of safety studies *should* be and then declares R.C. 4511.095 wanting. But the fact that the statute does not establish mandatory metrics for the placement of traffic cameras does not mean that the studies cannot be helpful in camera deployment.

{¶ 66} Further, the lead opinion ignores other benefits of safety studies, including governmental transparency. As discussed above, a central issue in the public debate over traffic cameras is whether municipalities are using the cameras to improve public safety or simply as a revenue grab. The safety study, which is "available to the public upon request," R.C. 4511.095(A)(1), can provide information on the motivations behind the placement of traffic cameras and allow for comparisons among jurisdictions using traffic cameras as to what sort of conditions make their use appropriate. An official study, establishing baseline information, can also aid policymakers and the public in deciding whether the addition of traffic cameras produces a significant safety benefit. In short, safety

studies help satisfy two concerns—whether traffic cameras are being deployed for safety purposes and whether they actually work.

{¶ 67} Equally unpersuasive are the lead opinion's objections to the required notice provisions: a public-information campaign about the location of future traffic cameras, R.C. 4511.095(A)(2); an announcement in a local newspaper about the use of cameras, R.C. 4511.095(A)(3); and a 30-day waiting period after installation before fines are levied, R.C. 4511.095(A)(4). The majority finds these components imperfect. It reasons that motorists who are from outside the local community will miss out on the public-information campaign and local-publication requirements. (It doesn't address why the 30-day, no-fine warning period is ineffective—every driver from everywhere would benefit from the delay in the enforcement of civil penalties.) The lead opinion concludes that "the statute's requirements do not serve the purpose of ensuring that the public traveling in the area has notice." Lead opinion at ¶ 26. For the lead opinion, because the publicity elements do not reach every possible motorist who might drive in a municipality for a long enough period of time, they are unconstitutional. If the publicity requirements were more onerous, if they made greater demands on municipalities, would they be acceptable to the plurality?

{¶ 68} Finally, as to R.C. 4511.0912, the speeding-leeway provision, the lead opinion states:

> With regard to whether R.C. 4511.0912 serves an overriding state interest, the state contends that the speeding-leeway provision accounts for errors in the driver's speedometer and errors of a traffic camera's measuring device and also creates amnesty for minor speeding infractions. We find the state's arguments unpersuasive.

Lead opinion at ¶ 23.

**{¶ 69}** Fair enough. We can take from this that if the members of the majority finding R.C. 4511.0912 unconstitutional had been elected to the General Assembly rather than to this court, they wouldn't have voted for that legislation. But whether judges think something is or is not in the overriding interest of the state seems far removed from the question of whether something is a general law.

**{¶ 70}** The General Assembly is not required to tell us its reasons for enacting legislation, so to try to divine its motives, or to require perfection in the motives we divine, is imprudent. Under our precedent, this court should not judge the merits of each statutory section in isolation but rather should evaluate whether the provision is part of a legislative scheme that addresses a subject in which there is an overriding state interest. Here, there can be no question about that state interest—the regulation of traffic. The state furthers that interest in S.B. 342 by providing a statewide, uniform framework for the use of traffic cameras.

**{¶ 71}** This court has long recognized that the regulation of traffic is a statewide concern. We have upheld laws that prevented municipalities from interfering with state speed-limit statutes, *Schneiderman v. Sesanstein*, 121 Ohio St. 80, 167 N.E. 158 (1929), and that required municipalities to create a permit process for the operation of oversized vehicles on a municipal streets, *Marich v. Bob Bennett Constr. Co.*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906. Other laws regarding traffic have statewide reach. Local authorities are bound by the state's manual for a uniform system of traffic-control devices and may use only those devices that conform with state standards. *Winwood v. Dayton*, 37 Ohio St.3d 282, 284, 525 N.E.2d 808 (1988); *Bibler v. Stevenson*, ___ Ohio St.3d ___, 2016-Ohio-8449, ___ N.E.3d ____, ¶ 14; R.C. 4511.11(A), (D) through (F).

**{¶ 72}** Similarly, this court has upheld legislation requiring markings of a " 'distinctive manner or color' " on police cars. *Dayton v. Adams*, 9 Ohio St.2d 89, 90, 223 N.E.2d 822 (1967), quoting R.C. 4549.13. In doing so, this court specifically noted that " 'uniformity is essential both for traffic safety and for

efficient traffic regulation.' " *Id*., quoting *Cleveland Hts. v. Woodle*, 176 Ohio St. 113, 116, 198 N.E.2d 68 (1964). Further, the court recognized the legislature's intent to "put a curb upon the speed traps which were often operated by 'peace officers' of the municipalities and townships." *Id.* at 90.

**{¶ 73}** In *Mendenhall*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, this court addressed whether R.C. 4511.21, which governs speed limits, was a general law under the third prong of the *Canton* test. We held that "R.C. 4511.21 has extensive scope and does more than grant or limit state powers. By establishing the rules regulating the speed of motor vehicles within Ohio, it is an integral part of the state's traffic laws." *Id*. at ¶ 24.

**{¶ 74}** R.C. 4511.13(C) and 4511.21(A) prohibit drivers from running red lights and from exceeding speed limits. The officer-present, safety-study, and speeding-leeway provisions at issue here determine how those existing statewide traffic laws will be enforced through the use of photo-enforcement technology. They address the circumstances in which Ohio's drivers are subject to the automated enforcement of those laws. They are directly connected to state laws regulating the public as part of the state's police power.

### III. The Concurrence's Reliance on the Fourth *Canton* Factor

**{¶ 75}** In what is perhaps an implicit acknowledgment of the rudderlessness of the lead opinion's analysis, the concurrence turns to the fourth prong of the *Canton* test to justify striking down the legislation. But in doing so, it applies the prong in a manner that is at odds with our post-*Canton* precedent.

**{¶ 76}** The fourth prong asks whether an enactment prescribes a rule of conduct upon citizens generally. The concurrence concludes that the three contested provisions do not because they apply not to citizens but to municipalities. And were not it for our past precedents, this might seem a fair argument.

**{¶ 77}** The problem is that we have insisted that in applying the fourth prong, the entire legislative scheme must be considered. "All sections of a chapter

must be read in pari materia to determine whether the statute in question is part of a statewide regulation *and whether the chapter as a whole prescribes a rule of conduct upon citizens generally*." (Emphasis added.)  *Mendenhall*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 27.  Remarkably, the chapter at issue in *Mendenhall*, R.C. Chapter 4511, "which as a whole regulates traffic laws and the operation of motor vehicles in the state of Ohio," *id*. at ¶ 23, is the exact same chapter that contains the challenged provisions at issue in this case.  Nowhere does the concurrence explain how that chapter could prescribe a rule of conduct for citizens generally when *Mendenhall* was decided in 2008, yet somehow not prescribe such a rule of conduct today.

{¶ 78} Indeed, this court has never relied exclusively on the fourth *Canton* factor in determining that a statute is not a general law, and it's almost impossible to reconcile what this court has done in the past with what the concurrence wants to do today.

{¶ 79} For example, in *Cleveland v. State*, 128 Ohio St.3d 135, 2010-Ohio-6318, 942 N.E.2d 370, we dealt with R.C. 9.68, "a statute * * * that provides that only federal or state regulations can limit an Ohioan's individual right to bear arms."  *Id*. at ¶ 1.  The court of appeals had held that the statute was not a general law because it did "not prescribe a rule of conduct upon citizens generally but instead limits lawmaking by municipal authorities."  *Id*. at ¶ 29.  We reversed, noting that there were numerous state laws that dealt with firearms.  *Id.* at ¶ 17-20.  Even though the specific enactment at issue primarily operated to restrict the authority of local governments, we concluded that it satisfied the fourth prong because it was part of an overall system of state laws that related to firearms: "Thus, when we consider the entire legislative scheme, as we must, we conclude that when interpreted as part of a whole, R.C. 9.68 applies to all citizens generally."  *Id.* at ¶ 29.

**{¶ 80}** Similarly, we have upheld the ability of the legislature to limit municipal regulation of predatory lending. In *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, we sustained legislation that prohibited municipal regulation of certain lending practices because it was part of a "comprehensive and uniform statewide enactment setting forth a police regulation that prescribed a general rule of conduct for lending in Ohio." *Id*. at ¶ 36.

**{¶ 81}** These cases are impossible to square with the result the concurrence wants to reach. If the provisions at issue today do not apply to citizens generally because they are directed at municipal governments, then the same must be said for the gun law in *Cleveland* and the predatory-lending provision in *Am. Fin. Servs. Assn.*

**{¶ 82}** In fairness, the concurrence is able to muster some support for its position. It points to a couple of pre-*Canton* cases in which we looked at the provision in isolation in determining whether the provision prescribed a rule of conduct upon citizens generally. *See Youngstown v. Evans*, 121 Ohio St. 342, 168 N.E. 844 (1929); *Linndale v. State*, 85 Ohio St.3d 52, 706 N.E.2d 1227 (1999). But one would think our more recent decisions should control. All this just demonstrates the loosey-goosiness of our home-rule jurisprudence. If one wants to achieve a particular result in the home-rule area, it is not hard to find a case in support.

### IV.    We Should Abandon the *Canton* Test

**{¶ 83}** If nothing else, the two opinions that set forth the opinions of those justices who make up the majority demonstrate the malleability and unpredictability of the *Canton* test. The lead opinion turns on two judgments it makes: first, its decision to look at the statutory provisions in isolation and second, its view that there is no overriding state interest that supports these provisions when viewed in isolation from the rest of the statutory scheme.

{¶ 84} The result-oriented nature of the lead opinion's approach is revealed by its elevation of the overriding-state-interest test as determinative of the third factor. One might think that a legislature comprising 132 members, elected on a proportional basis from across Ohio, is far better equipped to determine what is in the state's interest than seven members of the Ohio Supreme Court. But today, the plurality in essence says we know what is in the state's interest better than those 132 representatives of the people do. And if we don't think a law is a good idea, then it must not be a general law, and we can strike it down. A constitutional provision that says a "general law" will prevail over a municipal police-power regulation has been transformed into one that says a "good law" will prevail over a municipal police-power regulation. And we—the court—get to decide whether a law is good or not.

{¶ 85} The concurrence further demonstrates the capriciousness of this court's application of the *Canton* test: it chooses to ignore the place of the contested provisions in Ohio's broader traffic-law scheme, failing to address those post-*Canton* cases that would require it to do so.

{¶ 86} Fair to say, this court has gone far afield in attempting to resolve what is at heart a simple question in home-rule cases: Is the statute at issue a general law? We do not need a test to answer that question. We would be better off to abandon the *Canton* test and to simply apply the language of Article XVIII, Section 3.

{¶ 87} The lead opinion invokes stare decisis as justification for clinging to the *Canton* test. But "stare decisis" is not Latin for "we just make it up as we go." Aside from being clothed in the common garb of the *Canton* test, our decisions in this area have been so inconsistent that there is nothing to which to give stare decisis effect.

{¶ 88} "Although it is a vital rule of judicial self-government, *stare decisis* does not matter for its own sake. It matters because it 'promotes the evenhanded,

predictable, and consistent development of legal principles.' " *Johnson v. United States*, ___ U.S. ___, 135 S.Ct. 2551, 2563, 192 L.Ed.2d 569 (2015), quoting *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Standing by decisions that fail to promote evenhandedness, predictability, and consistency "undermine[s], rather than promote[s], the goals that *stare decisis* is meant to serve." *Id.* What we had before today was a test that produced unpredictable, inconsistent results seemingly reflecting the policy choices of that day's majority. The lead opinion's embrace of courts' expanded role in determining a statewide interest can only add to the ad hoc nature of general-law determinations. It's time to return to the Constitution.

### V. A Return to Applying the Text of the Home Rule Amendment Answers the Questions Before Us

**{¶ 89}** In interpreting constitutional text—especially a provision like Article XVIII, Section 3, which was voted on directly by the people in a September 3, 1912 special election—we look to how a voter at the time would have viewed the specific language:

> [W]e are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *United States v. Sprague,* 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931); see also *Gibbons v. Ogden,* 9 Wheat. 1, 188, 6 L.Ed. 23 (1824). Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.

*District of Columbia v. Heller*, 554 U.S. 570, 576–577, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

**{¶ 90}** A contemporary dictionary defined "general" as "[c]ompletely or approximately universal, including or affecting all or nearly all parts, not partial, particular, local, or sectional." *The Concise Oxford Dictionary of Current English* 342 (1912). The ordinary meaning of a "general law," then, would be a law that is universal, not local.

**{¶ 91}** Of course, the term "general law" is by its very nature a technical legal term, but one with an agreed-upon meaning at the time. It is one that is consistent with the ordinary meaning. As one delegate to the constitutional convention that crafted the provisions that would be voted upon at the 1912 election stated,

> The term "general law" is one that has been the subject of interpretation for many years. Courts have thoroughly well settled the construction of that term and we need have no doubt about what the future rule will be. Therefore you are not launching on any untried sea. You simply open the doors and lay down the bars for the municipality, big or little, to do everything it is not prohibited from doing by general laws.

2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1471-1472 (1913).

**{¶ 92}** At the time of the enactment of Article XVIII, Section 3, "general law" was defined thusly: "As opposed to 'private,' one relating to matters of public concern. As opposed to 'local,' one operative throughout the jurisdiction of the legislative body. As opposed to 'special,' one which affects equally all persons or things of the same class." 1 Walter A. Shumaker & George Foster Longsdorf, *The Cyclopedic Law Dictionary* 409 (1912).

34

**{¶ 93}** The framers of the provision and the voters of the state could have found a similar definition in the state's jurisprudence. In *Cincinnati St. Ry. Co. v. Horstman*, 72 Ohio St. 93, 73 N.E. 1075 (1905), this court offered the following definition of general law:

> "A law framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law."

*Id.* at 109, quoting *State ex rel. Van Riper v. Parsons*, 40 N.J.L. 123 (1878), paragraph one of the syllabus. This court cited the same definition in *Bronson v. Oberlin*, 41 Ohio St. 476, 481 (1885), and *Black's Law Dictionary* contained the same definition at the time of the enactment of the Home Rule Amendment, *Black's Law Dictionary* 710 (2d Ed.1910).

**{¶ 94}** Further, a voter at the 1912 election could have also relied on contextual cues from the language of the amendment to determine the meaning of "general laws." From "[m]unicipalities shall have the authority to * * * adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws," the voter would have distinguished "general laws" from the other types of laws mentioned in the provision, "local police, sanitary and other similar regulations." The voter would have understood that general laws are those not confined within a specific locality.

**{¶ 95}** This court should simply adopt the understanding of general laws from the time of the 1912 vote on the Constitution. A general law is a "law, framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished

by characteristics sufficiently marked and important to make them a class by themselves." *Horstman* at 109. A general law is one that operates uniformly throughout the state.

{¶ 96} Whether a statute is a general law should be the simplest aspect of determining whether a municipal ordinance or state statute prevails under an Article XVIII, Section 3 analysis. Does the statute have statewide reach and does it treat the objects of the law equally? The bulk of the analysis should concentrate on whether the ordinance in question addresses the operation of municipal government or whether it involves a police power and, if it does involve a police power, whether the exercise of the police power conflicts with the state's exercise of that power in the corresponding statute.

{¶ 97} Here, the police power and conflict issues are not in dispute. The city agrees that the regulation of photo-enforcement cameras is an exercise of police power and that its ordinances do conflict with the state legislation. Because the contested provisions apply uniformly across the state, they are general laws for purposes of Article XVIII, Section 3 of the Ohio Constitution. Because the contested provisions are general laws in which the state exercises its police powers, the Dayton ordinances must yield because they conflict with the state statutes.

{¶ 98} Therefore, I dissent from the majority's judgment that R.C. 4511.093(B)(1), 4511.095, and 4511.0912 violate the Home Rule Amendment.

O'NEILL, J., concurs in the foregoing opinion.

_____

Barbara J. Doseck, Dayton City Attorney, and John C. Musto, Assistant City Attorney, for appellant.

Michael DeWine, Attorney General, and Eric E. Murphy, State Solicitor, Michael J. Hendershot, Chief Deputy Solicitor, Hannah C. Wilson, Deputy Solicitor, and Jordan S. Berman, Assistant Attorney General, for appellee.

Jerome M. Strozdas, Springfield Law Director, urging reversal for amicus curiae city of Springfield.

Adam W. Loukx, Toledo Director of Law, and Joseph V. McNamara, Assistant Director of Law, urging reversal for amicus curiae city of Toledo.

Eve V. Belfance, Akron Director of Law, and John C. Reece and Michael J. Defibaugh, Assistant Directors of Law; and DiCaudo, Pitchford & Yoder and Stephen A. Fallis, urging reversal for amicus curiae city of Akron.

Willa Hemmons, East Cleveland Director of Law, urging reversal for amicus curiae city of East Cleveland.

Frost Brown Todd L.L.C., Philip K. Hartmann, and Yazan S. Ashrawi; and Garry E. Hunter, urging reversal for amicus curiae Ohio Municipal League.

Mayle, Ray & Mayle, L.L.C., Andrew R. Mayle, Jeremiah S. Ray, and Ronald J. Mayle, urging affirmance for amicus curiae Custom Seal, Inc.

_____